**55IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

Civil Action No. 2:25-cv-00254-WKW-CWB

BRADLEY HARRIS,

    Petitioner,

v.

MILTON WASHINGTON, in his official
capacity as Warden of FPC Montgomery,

     Respondent.

---

**SECOND AMENDED PETITION FOR WRIT OF HABEAS CORPUS
PURSUANT TO 28 U.S.C § 2241**

---

Petitioner Bradley Harris respectfully petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 and alleges as follows:

**PARTIES AND JURISDICTION**

1.    Mr. Harris is currently incarcerated and in custody of the Bureau of Prisons ("BOP") at Federal Prison Camp ("FPC") Montgomery located at Maxwell Air Force Base, 1001 Willow Street, Montgomery, Alabama, 36112.

2.    Mr. Harris is a citizen of the United States.

3.    Upon information and belief, Respondent Milton Washington is the Warden of FPC Montgomery. Respondent Washington is named in his official capacity as the custodian of Mr. Harris.

4.    This Court has jurisdiction over this petition pursuant to 28 U.S.C. § 2241, as Mr. Harris is currently in custody under the authority of the United

States and is confined at FPC Montgomery, which is located within the Middle District of Alabama.

5. Venue is proper in this Court under 28 U.S.C. § 2241, as Mr. Harris is incarcerated in this District and the events giving rise to this petition occurred within this District.

## STATEMENT OF FACTS

### I. Mr. Harris's Sentencing

6. Mr. Harris was convicted in the United States District Court for the Northern District of Texas of Conspiracy to Commit Healthcare Fraud and Health Care Fraud.

7. On January 25, 2022, the United States District Court for the Northern District of Texas sentenced Mr. Harris to 159 months of detention, with 3 years of supervised release, for being found guilty of Conspiracy to Commit Healthcare Fraud and Health Care Fraud.

8. The Docket Number is 3:17-CR-00103-M(1).

9. Mr. Harris was committed to federal prison on February 22, 2022.

### II. The First Step Act's Time Credit Provisions

10. In 2018, Congress overwhelmingly passed—and President Trump signed—The First Step Act ("FSA" or the "Act"), a comprehensive legislative effort to "allow[] prisons to help criminals transform their lives . . . so that we are not perpetuating the cycle of crime that continues to plague communities across the country." 164 Cong. Rec. S7639, S7642 (Dec. 17, 2018) (statement of Sen. John Cornyn).

11.     A centerpiece of the FSA is a system of earned time credits, also referred to as "Federal Time Credits" or "FTCs," that incentivizes eligible federal inmates to participate in programs designed to reduce recidivism.

A.     Earning Time Credits

12.     The FSA provides that an eligible person who "successfully completes evidence-based recidivism reduction programming or productive activities, *shall* earn time credits." 18 U.S.C. § 3632(d)(4)(A) (emphasis added).

13.     Each time credit is equal to one day of imprisonment. *Id.* § 3632(d)(4)(A)(i).

14.     The FSA further provides that time credits "shall" be earned as follows:

(a)     First, a "prisoner shall earn 10 days of time credits for every 30 days of successful participation in evidence-based recidivism reduction ("EBRR") programming or productive activities ("PAs")." *Id.* § 3632(d)(4)(A)(i).

(b)     Second, a "prisoner determined by the Bureau of Prisons to be at a minimum or low risk of recidivating, who, over 2 consecutive assessments, has not increased their risk of recidivism, shall earn an additional 5 days of time credits for every 30 days of successful participation in evidence-based recidivism reduction programming or productive activities." *Id.* § 3632(d)(4)(A)(ii).

15.     Accordingly, under the FSA's statutory scheme, an eligible person who satisfies the minimum- or low-risk requirements of § 3632(d)(4)(A)(ii) shall earn 15

days of time credits for every 30 days of successful participation in programming contemplated by the FSA.

16.     The earned-time-credit program reinforces the underlying mission of the Act: to incentivize persons to participate in EBRR programming and PAs in order to reduce their time spent in prison.

17.     The FSA's earned-time-credit system is not entrusted to the discretion of the BOP: an eligible person "who successfully completes evidence-based recidivism reduction programming or productive activities *shall* earn time credits." *Id.* § 3632(d)(4)(A) (emphasis added).

18.     In addition, the FSA provides that "[t]he incentives described in this subsection *shall* be in addition to any other rewards or incentives for which a prisoner may be eligible." *Id.* § 3632(d)(6) (emphasis added).

B.     Applying Time Credits

19.     Once an eligible person completes programming while in custody, the BOP has a non-discretionary duty to apply the earned time credits to the prisoner's sentence. *See id.* § 3632(d)(4)(C) ("Time credits earned . . . by prisoners who successfully participate in recidivism reduction programs . . . *shall be applied* toward time in prerelease custody or supervised release." (emphasis added)).

20.     The BOP also has a statutory duty to apply earned FSA time credits towards either "time in prerelease custody or supervised release." *Id.*

(a)     "Prerelease custody" refers to either (i) home confinement or (ii) placement in a residential reentry center, commonly referred to as a halfway

4

house. Time credits applied towards prerelease custody make a person eligible for early placement in home confinement or early placement in a residential reentry center. *See id.*; *see also id.* § 3624(g)(2). The statute does not limit the number of time credits that may be applied towards early placement in prerelease custody.

(b)     "Supervised release" refers to a form of supervision that occurs after a person completes the prison term (commonly referred to as federal probation and/or parole). Time credits applied to supervised release allow an incarcerated person to begin their period of supervised release early. *Id.* § 3624(g)(3). If the person's sentence includes a period of supervised release, then the BOP can apply up to 365 time credits toward the person's supervised release date. *Id.* Applying 365 credits toward supervised release is the equivalent of taking one year off a person's sentence.

21.     The FSA's statutory scheme requires the BOP to apply time credits to either (a) move up the date by which a person is eligible for prerelease custody or (b) move up the date by which a person is eligible for supervised release.

22.     Time credits earned under the FSA can be "stacked" with prerelease custody time that inmates earn under other statutes, such as the Second Chance Act ("SCA"), to calculate a person's placement date in prerelease custody and early supervised release.

23.     The graphic below from the BOP February 2024 First Step Act Admission and Orientation Addendum (FPC Morgantown) illustrates how FTCs may be applied. U.S. Dep't of Just., Fed. Bureau Prisons, First Step Act & Fed.

Time Gen. Info. Admin. & Orientation Addendum (Feb. 2024) ("Morgantown Addendum").[1] Ex. 1. The first row represents how days can be distributed between supervised release (depicted in orange) and prerelease custody (depicted in green). The second row represents how FSA time credits (depicted in orange) can be "stacked" with SCA eligibility dates (depicted in green) to move up a person's eligibility for prerelease custody.



Ex. 1 (Morgantown Addendum), at 75.

---

[1] Upon his admission to FPC Montgomery in August 2022, Mr. Harris received a substantially similar document: BOP First Step Act Admission and Orientation Addendum (FPC Montgomery) ("Montgomery Addendum"). The Montgomery Addendum (which is in black and white and of poorer print quality than the Morgantown Addendum) is attached to this petition as Exhibit 2. BOP prisons routinely provide such materials to newly arriving inmates to inform them of relevant programs, services, policies, and procedures. *See* Fed. Bureau of Prisons, *Entering Prison: What to expect upon admission to an institution.*, https://www.bop.gov/inmates/custody_and_care/entering_prison.jsp (last visited Dec. 29, 2025).

24.     The FSA explicitly provides that the BOP "shall transfer eligible prisoners . . . into prerelease custody or supervised release" when conditions are met. 18 U.S.C. § 3632(d)(4)(C). There is no option to retain the prisoner in an institutional prison setting, and all credits for the duration of the inmate's sentence must either be applied toward early supervised release or early prerelease custody.

25.     Crucially, the FSA provides that an eligible "prisoner" who successfully completes EBRR programming or PAs "shall" earn time credits. *Id.* § 3632(d)(4)(A). The statute further provides only two circumstances in which an otherwise eligible prisoner "may not earn time credits": (i) for programming completed "prior to the date of [the FSA's] enactment" and (ii) for programming completed "during official detention prior to the date that the prisoner's sentence commences . . . ." *Id.* § 3632(d)(4)(B). Because a prisoner remains in BOP "custody" during prerelease custody, the FSA mandates that eligible prisoners continue to earn credits for programming completed while in prerelease custody.

26.     The FSA also contemplates that "[a] prisoner placed in prerelease custody . . . who is placed in home confinement . . . may leave the prisoner's home in order to," among other reasons, "participate in [EBRR programming] or [PAs] assigned by the System." *Id.* § 3624(g)(2)(A)(i)(II)(bb). This provision expressly reaffirms that eligible prisoners are able to complete EBRR programming and PAs in prerelease custody. Accordingly, the FSA allows them to earn credits while doing so.

7

C.      The FSA Time Credit Assessment Sheet

27.      On September 5, 2024, the BOP released a projection tool that projects an inmate's FSA Conditional placement date based on the above calculations.

28.      The BOP generates individual projections each month and includes these projections in each inmate's monthly FSA Time Credit Assessment Sheet. Mr. Harris's November 2025 Assessment Sheet is attached as Exhibit 3.

29.      Mr. Harris's November 2025 Assessment Sheet contains several projections, including:

- Projected Release Date: 05-19-2033
- FSA Projected Release Date: 05-19-2032
- Conditional Release Date: 05-19-2032
- FSA Conditional Placement Days: 935
- FSA Conditional Placement Date: 10-27-2029

Ex. 3, at 3. These projections are relevant for several reasons.

30.      First, the "Projected Release Date" (May 19, 2033) indicates the date on which Mr. Harris is projected to be released from prison, before any FSA credits or SCA time are applied, but after any good conduct time credits are projected and frontloaded. Ex. 3, at 3; *see also* Ex. 4 (Fed. Bureau of Prisons, Correctional Programs Branch, *Use of Home Confinement as a Release Option*), at 5.

31.      Second, the "FSA Conditional Release Date" (May 19, 2032) indicates the date on which Mr. Harris may become eligible for supervised release once the first 365 FSA credits are applied. Ex. 3, at 3; *see also* Ex. 4, at 4.

32.      Third, the "FSA Conditional Placement Date" (October 27, 2029) indicates the projected date on which Mr. Harris may become eligible for prerelease

8

custody once FSA credits, in excess of 365 credits, are applied. Ex. 3, at 3; *see also* Ex. 4, at 7; Ex. 7 (Fed. Bureau of Prisons, Memorandum from William K. Marshall, III, *Memorandum for All Chief Executive Officers: Use of Home Confinement as a Release Option* at 1-2 (June 17, 2025)).

33.    Notably, both the FSA Conditional Release Date and FSA Conditional Placement Date projections *are based on the maximum number of time credits that Mr. Harris may earn.* The FSA Conditional Placement Date is based on the BOP's calculation of the *total possible conditional placement days* (935) that Mr. Harris is eligible to earn. Ex. 3; *see also* Ex. 4 at 7; Ex. 7 at 1–2.

34.    These projections have a concrete and ongoing effect on Mr. Harris's incarceration status. For example. FSA projections will be consolidated with Mr. Harris's SCA time, resulting in earlier eligibility for prerelease custody. In addition, Mr. Harris's projected release date determines his enrollment priority in the Residential Drug Abuse Program ("RDAP"), the completion of which may subtract up to an additional year from a prisoner's sentence.

35.    As detailed below, the BOP misapplied the FSA and failed to properly calculate accumulated and projected FSA days, in violation of Mr. Harris's rights under the Act.

## III.    The BOP's Misapplication of the First Step Act

36.    The BOP has a pattern of misinterpreting sentence reduction statutes in ways that extend incarceration beyond congressional intent. This pattern first emerged with the passage of the 1984 Sentencing Reform Act, which enabled

9

prisoners to earn Good Conduct Time ("GCT") credit against prison time as a reward for good behavior. The BOP chose to calculate GCT credits narrowly, limiting the number of credits a prisoner could earn by waiting until the end of each year to apply a prisoner's credits and limiting the number of credits that could be earned to time served, rather than a prisoner's imposed sentence. *See Barber v. Thomas*, 560 U.S. 474, 493-94 (2010) (Kennedy, J., dissenting) (criticizing GCT calculation method as "impos[ing] tens of thousands of years of additional prison time on federal prisoners according to a mathematical formula they will be unable to understand").

37.     The BOP's restrictive calculation method necessitated explicit congressional correction through the passage of the FSA. *See* First Step Act, S. 3747, 115th Cong. (2018) (enacted), https://www.congress.gov/bill/115th-congress/senate-bill/3747/text (striking "each year of the prisoner's term of imprisonment" and inserting "for each year of the prisoner's sentence imposed by the court," while explaining that the FSA permits the BOP to award up to 54 days of GCT); 18 U.S.C. § 3624(b)(1). Pursuant to Congress's amendment, enacted as part of the same statutory scheme as the FSA, the BOP began to administratively front-load projected GCT credits when computing prisoners' sentences.

38.     Now, however, the BOP continues to misinterpret the FSA's system of earned time credits narrowly, in violation of both the plain language and intent of the Act.

39.     The BOP's failure to properly interpret the FSA's unambiguous statutory language has prejudiced Mr. Harris in the following three ways.

A.     <u>The BOP Has Treated Mandatory Earning Days as Discretionary</u>

40.     In 2022, more than three years after the FSA's enactment, the BOP adopted new regulations purporting to implement the statute's system of earned time credits. *See* 28 C.F.R. § 523.44. The BOP's regulation conflicted with the FSA's text by treating the application of earned time credits as permissive rather than mandatory.

41.     While the FSA provides that any earned time credits "*shall* be applied" toward early prerelease custody or supervised release where certain conditions are met, 18 U.S.C. § 3632(d)(4)(C) (emphasis added), the BOP's regulation provides that the BOP "*may* apply FSA Time Credits toward prerelease custody or supervised release" where certain conditions are met. 28 C.F.R. § 523.44(a)(1) (emphasis added); *see also id.* at § 523.44(c)–(d).

42.     The BOP has taken the position in litigation (in this court and others) that the BOP has discretion over whether and when to apply earned time credits. *See, e.g.*, Sur-reply to Petr.'s Reply in Supp. of Writ of Habeas Corpus Pursuant to 28 U.S.C. 2241 at 7, *Gattis vs Jacquez*, No. 3:23-cv-00301 (D. Ore. Oct 2, 2023), ECF No. 23 (asserting that "[t]he FSA thus merely accelerates when an inmate may be considered for prerelease custody, but the FSA does not strip BOP's discretion to make that decision").

43.     The BOP's misinterpretation of the statute has prejudiced Mr. Harris because the BOP has failed to credit Mr. Harris for days of programming that are required by the statute.

44.     Courts have held that 18 U.S.C. § 3632(d)'s provisions "make it clear that prisoners 'shall' earn time credits, at the statutory rate, for all qualified programs in which they successfully participate, except for the programs in which they participated in while imprisoned either before the FSA was enacted, or in detention before the date when their sentence commence[d] under 3585(a)." *Komando v. Warden, FCI Berlin*, 22-cv-425-SE, 2023 WL 4101540, 2023 U.S. Dist. LEXIS 70827, at *8 (Mar. 16, 2023), *report and recommendation adopted*, 2023 WL 4101457 (D. N.H. Apr. 23, 2023).

45.     Mr. Harris is eligible to earn credits under the FSA and has consistently participated in EBRR programming and PAs from February 22, 2022, to the present. Ex. 3 (Nov. 2025 Assessment Sheet), at 1 (stating that Mr. Harris began to accrue days on February 22, 2022).

46.     Despite Mr. Harris participating in FSA programming and otherwise meeting all statutory eligibility requirements to earn FSA credits, the BOP has failed to apply his lawfully earned FSA credits in two ways.

(a)     First, the BOP unlawfully withheld FSA credits from Mr. Harris while he was in transport to new facilities. The FSA does not contain a statutory exception that prevents prisoners from earning time credits while they are in transport if they are otherwise enrolled in FSA programming. Ex. 5 (May 2025

Assessment Sheet), at 1–2 (listing 72 days in which Mr. Harris was in "disallow" status due to transfers).

(b)     Second, the BOP unlawfully withheld FSA credits for days it claims Mr. Harris was in refusal status for failing to pay his restitution ("FRP") payments. However, the FSA does not contain a statutory exception that prevents prisoners from earning time credits for failure to make FRP payments while they are enrolled and participating in FSA-eligible programming. Ex. 5 (May 2025 Assessment Sheet), at 1 (listing 133 days in which Mr. Harris was in "disallow" status due to "FRP – Refuse").

47.     Only after Mr. Harris exhausted his administrative remedies and sought congressional assistance did the BOP credit him with an additional 65 days of programming that had been withheld due to a clerical error in calculating FRP refusal dates. *Compare* Ex. 5, (May 2025 Assessment Sheet) (listing an additional 65 days in which Mr. Harris was in "refuse" status) *with* Ex. 3 (Nov. 2025 Assessment Sheet) (removing the 65 days in which Mr. Harris was in "refuse" status). However, the BOP's updated calculations fail to credit Mr. Harris with the remaining 140 days of programming, which the BOP continues to list as "disallowed." Ex. 3 (Nov. 2025 Assessment Sheet), at 1 (listing 140 disallowed programming days).

48.     A decision of this Court has already instructed the BOP, and FPC Montgomery specifically, to apply FSA credits from the commencement of the sentence, including during transit. *See Sharma v. Peters*, 756 F. Supp. 3d 1271

13

(M.D. Ala. 2024). In *Sharma*, the Court held that the BOP had improperly failed to credit the petitioner with credits under the FSA based on inapposite factors from the BOP's regulations. In doing so, the Court held that "[t]he BOP must apply time credits to eligible prisoners who have earned them and cannot categorically make prisoners ineligible for such credits in a manner that contravenes the statutory scheme set forth in 18 U.S.C. § 3632." *Id.* at 1284. The Court further held "that the additional exclusions in 28 C.F.R. § 523.41(c)(4)(i–iv), which are not found in the language of the FSA, cannot categorically be applied to render [a person] ineligible from earning or applying FTCs to which he may be entitled." *Id.*

49.      Similarly, this Court's subsequent unpublished decision in *Woolsey v. Washington* addressed the BOP's practice of marking program participation days as "disallowed" based on non-statutory exclusions, including days when an inmate is awaiting transport post-sentencing and days in transit between facilities. *See Woolsey v. Washington*, Case No. 2:25-cv-137-WKW, 2025 WL 2598794, 2025 U.S. Dist. LEXIS 174474, at *4 (M.D. Ala. Sept. 8, 2025). The court noted that the BOP had designated 47 program days as "disallowed"—37 days while the petitioner awaited transport after sentencing and 10 days during a pending transfer—and held that such categorical "disallowed" designations are reviewable because they derive from regulations that may conflict with the FSA's text. *Id.*, at *4, *45–46 *Woolsey* further recognized that the FSA's use of "shall" in § 3632(d)(4)(C) imposes a mandatory duty to apply earned time credits to eligible prisoners and that the BOP may not rely on regulatory carve-outs, such as 28 C.F.R. § 523.41(c)(4)(iii), to

14

categorically deny credit for in-transit periods that the statute does not exclude. *See id.* at *41–42.

50.     The BOP has recently credited another habeas petitioner at FPC Montgomery with days that were previously disallowed on grounds that he was away from his designated facility. *See* Ans. and Resp. to Habeas Petition, ECF No. 19, *Galanis v. Delafoisee*, Case No. 2:24-cv-00542-ECM (M.D. Ala. Dec. 20, 2024).

51.     As in these cases, the BOP improperly denied Mr. Harris credits for disallowed days based on inapposite factors, in violation of the FSA.

B.     <u>The BOP Has Failed to Credit Mr. Harris for the Full Number of Time Credits for the Completion of Successful Programming</u>

52.     The FSA provides that an eligible person who satisfies the minimum- or low-risk requirements of 18 U.S.C. § 3632(d)(4)(A)(ii) shall earn an additional 5 days of time credits for every 30 days of participation in EBRR programming or PAs, for a total of 15 time credits for every 30 days of participation in EBRR programming or PAs.

53.     Mr. Harris has continually met the minimum- or low-risk requirements of § 3632(d)(4)(A)(ii) while incarcerated.

54.     As outlined above, the BOP recently credited Mr. Harris with an additional 65 days of FSA programming that were originally categorized as "disallowed." *Compare* Ex. 5 (May 2025 Assessment Sheet), at 1, *with* Ex. 3 (Nov 2025 FSA Time Credit Assessment), at 1 (reflecting a 65-day decrease in Mr. Harris's "Disallowed Program Days").

55.     However, when the BOP provided Mr. Harris with an updated time credit calculation that purported to fix this issue, the BOP only increased Mr. Harris's total projected "conditional placement" days by 15 credits—from 920 to 935. *Compare* Ex. 5 (May 2025 Assessment Sheet), at 3, *with* Ex. 3 (Nov 2025 FSA Time Credit Assessment), at 3 (reflecting only a 15-day increase in Mr. Harris's "FSA Conditional Placement Days").

56.     The BOP's inaccurate projection indicates that the BOP is failing to properly credit Mr. Harris with 15 time credits for every 30 days of participation in EBRR programming or PAs, in violation of 18 U.S.C. § 3632(d)(4)(A)(ii).

C.     <u>The BOP Is Effectively Prohibiting Persons from Earning Time Credits for Programming Completed in Prerelease Custody.</u>

57.     The FSA's time credit provisions apply to any eligible prisoner. 18 U.S.C. § 3632(d)(4)(A). The statute defines a "prisoner" as "a person who has been sentenced to a term of imprisonment pursuant to a conviction for a Federal criminal offense, or a person in the custody of the Bureau of Prisons." *Id.* § 3635(4).

58.     Federal law provides that an incarcerated person remains in BOP custody during a period of prerelease custody, such as time spent in home confinement or a residential reentry center. *Id.* § 3624(c).

59.     After the passage of the FSA, the BOP was initially reluctant to grant FSA credits while inmates were on prerelease custody, and, in fact, proposed a rule that stated that "FSA Time Credits can only be earned while an inmate is in a Bureau Facility, and will not be earned if an inmate is in a Residential Reentry Center or on home confinement." FSA Time Credits, 28 C.F.R. §§ 523, 541 (2022),

16

https://www.federalregister.gov/documents/2022/01/19/2022-00918/fsa-time-credits.
Ex. 6 (Supplementary Information) at 2712.

60.    This proposed rule received an intense backlash from lawmakers and other stakeholders who had been instrumental in passing the FSA. Senator Sheldon Whitehouse (D-RI) and Senator John Cornyn (R-TX) submitted a joint comment stating that the BOP's "interpretation is not consistent with the goals of the First Step Act." *Id.* The comment continued that because "[p]rerelease inmates at an RRC remain in Federal custody while serving a sentence imposed by a U.S. District Court or DC Superior Court, they are 'prisoners' for the purposes of the First Step Act. Nor does the First Step Act distinguish 'prisoners' who are serving their sentences in a BOP institution, in an RRC, or on home confinement in describing the time credit program." *Id.*

61.    Current House Minority Leader Hakeem Jeffries (D-NY) commented as well, stating, "I see no reason to make individuals in RRC's or in home confinement ineligible to earn time credits. Congress could have chosen a narrower definition or explicitly excluded certain categories of individuals based on where they serve their sentence, but it chose not to do so." *Id.*

62.    The BOP reversed its position in response to these and other comments. In its Response, the BOP wrote "[a]fter carefully considering the comments received, the Bureau agrees that inmates in prerelease custody—whether in a RRC or on home confinement—are eligible to earn FSA Time Credits under 18

17

U.S.C. § 3632(d)(4)(A), which they could presumably apply, under 18 § U.S.C. 3632(d)(4)(C), toward transfer to supervised release." Ex. 6, at 2712.

63.    The BOP has subsequently reaffirmed this interpretation in both official and unofficial statements. An internal memorandum issued by the BOP provides that FSA credits should be applied to "maximize prerelease time in community custody." Ex. 7, at 1. The memorandum continues that BOP personnel are instructed to provide conditional placement dates "to determine when an individual shall be referred to prerelease custody." *Id.* The memorandum explains that these dates are based on "the projected accumulation of FSA Earned Time Credits (FTCs), assuming the individual continues to participate in eligible programming and remains free from disqualifying infractions," and "are therefore *forward-looking tools* for release planning." *Id.* at 1–2.

64.    Both the Morgantown Addendum and the Montgomery Addendum similarly require the full forecasting of FSA credits. Ex. 1, at 74; Ex. 2, at 10.

65.    Both the Morgantown Addendum and the Montgomery Addendum affirmatively state that eligible inmates earn FTCs "while in Halfway and/or Home Confinement." Ex. 1, at 74; Ex. 2, at 10. They further explain that the BOP "will project the maximum number of FTCs which can be earned during your term of incarceration. This will assist in determining the earliest eligible pre-release date." Ex. 1, at 74; Ex. 2, at 10. Taken together, this language unambiguously requires the BOP to project the total number of FTCs an inmate can earn throughout their entire term of incarceration, including FTCs that may be earned by completing

programming during prerelease custody. The purpose of this projection is explicitly stated to "determine[e] the earliest eligible prerelease placement date." Ex. 1, at 74; Ex. 2, at 10. Thus, the BOP's own policy requires consideration of all *potential* FTCs when calculating release dates.

66.    The BOP's public statements have reaffirmed the ability of persons to earn FSA credits throughout the duration of their sentence, including in prerelease custody.

(a)    On November 7, 2023, Collete S. Peters, then-BOP Director, testified before the House of Representatives Subcommittee on Crime and Federal Government Surveillance that the BOP had "clarified that time credit could continue to be earned while an individual is in a community placement such as a Residential Reentry Center or on home confinement, so long as the individual continues to comply with all the rules and procedures of prerelease custody." Ex. 8, *Oversight of the Federal Bureau of Prisons: Hearing Before the Subcomm. on Crime & Fed. Surveillance of the H. Comm. on the Judiciary*, 118th Cong. 9 (2023) (statement of Colette S. Peters, Director, Federal Bureau of Prisons).

(b)    At an April 2024 BOP Town Hall discussing FSA time credits, Jeremy Cooper, the Regional Correctional Programs Administrator for the BOP, explained that "the first 365 days of FTCs are applied towards your release date, meaning you will release 365 days earlier" and "[a]ll additional earned FTCs are applied toward prerelease placement." Fed. Bureau of Prisons, *First Step Act Town Hall Video Released*, at 16:35–16:47 (July 15, 2024),

19

https://www.bop.gov/news/20240715-fsa-town-hall.jsp. Mr. Cooper elaborated that "FTCs towards prerelease placement are only limited by the number of days you have remaining on your sentence." *Id.* at 16:47–16:53.

(c)     A May 28, 2025 Press Release by the BOP Office of Public Affairs states that the BOP "must use FSA and SCA Conditional Placement Dates—based on projected Earned Time Credits (FTCs) expected to earn—to guide prerelease planning and ensure accurate and timely referrals." Ex. 9, U.S. Dep't of Just., *Press Release: Bureau of Prisons Issues Directive to Home Confinement, Advance First Step Act* at 1 (May 28, 2025), https://www.bop.gov/news/pdfs/ 20250528-home-confinement-expansioin.pdf.

(d)     A June 17, 2025 Press Release by the BOP Office of Public Affairs details a new BOP directive to ensure that "qualified individuals [will] serve meaningful portions of their sentences in home confinement when appropriate" and that "Conditional Placement Dates—based on *projected* credit accrual and statutory timelines—will drive timely referrals, not bureaucratic inertia." Ex. 10, U.S. Dep't of Just., *Press Release: Bureau of Prisons Issues Directive to Fully Implement First Step Act and Second Chance Act* (June 17, 2025), https://www.bop.gov/news/pdfs/ 20250618-fsa-directive-and-sca.pdf. (emphasis added).

(e)     A July 14, 2025 statement by Rick Stover, the Senior Deputy Assistant Director of the BOP Designation and Sentence Computation Center, acknowledges staff and inmate frustration and confusion "with the complexities of FSA time credit calculations" and states that "[t]he Director has made it clear that

20

home confinement use should be maximized." Ex. 11, Fed. Bureau of Prisons, *Director Marshall Launches FSA Task Force* at 2 (July 14, 2025), https://www.bop.gov/news/20250714-director-marshall-launches-fsa-task-force.jsp.

67. The BOP's formal rules, sworn testimony, public guidance, and internal directives consistently acknowledge that persons in prerelease custody remain in service of their sentence and continue earning FSA credits, and that Conditional Placement Dates must reflect projected accrual of credits. Yet, the BOP's operational practice and explanatory letters concede that credits expected to be earned during prerelease custody are excluded from the very projections that control prerelease timing.

68. This conflict renders prerelease credits functionally unusable for advance placement, undermines the FSA's incentive structure, and produces arbitrary disparities in outcomes that the statute does not contemplate or permit.

69. Specifically, the BOP has chosen to apply the first 365 days of FSA time credits to supervised release. This means that prisoners with longer sentences (such as Mr. Harris) will have their supervised release date moved up by a year once they complete FSA programming that equals 365 days of time credits.

70. Next, after a prisoner earns their maximum allotted 365 days of supervised release time credits, the BOP has chosen to apply any remaining credits to move up the date that the inmate is eligible for prerelease custody. Because there is no limit on how many prerelease custody time credits can be earned, the prerelease custody time credits can continue to be applied to move up an inmate's

projected placement into prerelease custody (halfway house or home confinement). The BOP's method of applying time credits is illustrated by the blue arrows in the graphic below.



71.     On information and belief, the BOP's initial September 2024 Time Credit Assessment Sheet projected a prisoner's maximum FSA time credits based on the total time credits that a prisoner would be *eligible* to earn throughout the duration of their sentence, including future projected time credits that a prisoner would earn in prerelease custody. This projection method mirrors the projection method that the BOP currently uses to project GCT credits.

72.     However, on information and belief, when the BOP began including these projections in the September 2024 Time Credit Assessment Sheet, it recognized that its long-awaited projection revealed that inmates who were eligible for transfer to prerelease custody had remained in a prison setting for far longer than the FSA permits.

73.     Following September 2024, the BOP changed its FSA time credit projections for inmates. Beginning with the October 2024 assessment sheets, the BOP now takes the position that FSA time credits cannot be applied until the prisoner completes FSA programming days.

74.     The BOP's current projection method means that an inmate only becomes eligible for prerelease custody once the inmate's *completed* FSA time credits equal the number of days remaining in the inmate's sentence. But because the BOP applies FSA time credits to "max out" a prisoner's 365 days of supervised release before it applies FSA time credits to move up a prisoner's eligibility for prerelease custody, this effectively means that most prisoners (including Mr. Harris) cannot apply *any* time credits earned for programming that a prisoner completes *during* prerelease custody.

75.     The BOP adopted this calculation method while outwardly representing that it is possible for inmates to continue earning FSA time credits while in prerelease custody. This representation is misleading. Moreover, the projections in the BOP's FSA Time Credit Assessment sheets issued from October 2024 onward do not include days spent in prerelease custody in their projection of the maximum number of FSA Conditional Placement days that an inmate may earn.

76.     The BOP recently acknowledged that its FSA time credit calculation methods have been flawed. In a November 19, 2025 video, BOP Deputy Director Joshua J. Smith declared that the DOJ and the BOP, under the previous

23

presidential administration, had "buil[t an FSA] time credit calculator that has never worked right." Fed. Bureau of Prisons, *Video Message from the Deputy Director*, at 3:10 (Nov. 19, 2025), https://www.bop.gov/news/20251119-video-message-from-the-deputy-director.jsp.

77.    In an October 8, 2025 video interview, Rick Stover, the Special Assistant to the Director of the BOP, stated that the BOP has begun projecting "conditional release dates" based on the assumption that inmates will continue to participate in programs for the duration of their sentence. YouTube, *Chrisley Confessions 2.0 with Todd Ep. 13*, at 9:10–9:44 (Oct. 8, 2025), https://www.youtube.com/watch?v=z3pAmaT_nX8.

78.    However, a video presentation on Federal Time Credit Application posted to the BOP's website on October 16, 2025, continues to reflect that individuals "cannot earn additional credits while in the community on time credits." Fed. Bureau of Prisons, *Federal Time Credit Application Guide*, at 1:44–1:47 (Oct. 16, 2025), https://www.bop.gov/news/20251016-federal-time-credit-application-guide.jsp.

79.    The BOP's flawed calculation method has effectively foreclosed the ability of individuals to earn FSA time credits in prerelease custody, in contravention of the FSA and the BOP's own policy.

80.    Due to the BOP's flawed calculation method, Mr. Harris's projected FSA Conditional Placement date is more than a year later than it would be if he were credited for programming completed in future prerelease custody. When

24

combined with SCA time, Mr. Harris's projected eligible prerelease custody date should be May 20, 2027. *See* Ex. 12 (Mr. Harris's Manual Corrected Time Credit Calculation). However, under the BOP's current projections, Mr. Harris will not be eligible until December 31, 2028. *See* Ex. 3 (Nov. 2025 Assessment Sheet).

81.     When Mr. Harris's family contacted Senator Cornyn's office to raise this issue, the BOP responded to the Senator's inquiry by stating that the BOP was would not credit Mr. Harris with any time earned in prerelease custody, asserting that "[i]t is not possible . . . to retroactively apply time credits earned while in prerelease custody to effect an earlier placement in prerelease custody." Ex. 13, Aug. 1, 2025 Resp. to Senator Cornyn. The BOP stated that "[e]ligible individuals can and do earn FSA time credits while in prerelease custody" if they "have not reached the 365-day limit for application of credits toward early release to supervision." *Id.* Confoundingly, however, the BOP then asserted that it "provides individuals with a *best-case scenario* estimate for their earliest possible FSA prerelease custody placement date if they remain eligible to earn and apply FSA time credits *throughout* their incarceration." Ex. 13, July 2, 2025 Resp. to Senator Cornyn, at 1 (emphases added).

82.     The BOP's response ignores that, as a matter of practice, the BOP consistently applies FSA time credits toward a prisoner's supervised release *first*. Accordingly, the only prisoners who can earn credits while in prerelease custody are those who failed to complete any programming while in prison and those whose imposed sentence is not long enough to reach the 365-time-credit threshold prior to

25

transfer to prerelease custody. This unreasonable outcome fails to incentivize participation in FSA programming during incarceration, as intended by the FSA's drafters. The BOP's calculation methods and projections further fail to provide individuals with a statutorily aligned "best-case scenario" of their placement in prerelease custody.

83.    To remedy its flawed projection method, Mr. Harris requests that the BOP project Mr. Harris's eligibility for prerelease custody by including FSA credits Mr. Harris is projected to earn while in prerelease custody, thus having his eligibility for prerelease custody reflect his projected accumulation of FSA time credits, assuming Mr. Harris continues to participate in eligible programming and remains in qualifying status, as demonstrated in Exhibit 12.

## IV. Mr. Harris Has Satisfied All Requirements to Bring this Lawsuit

A.    <u>Mr. Harris Exhausted the BOP's Procedural Remedy Requirements</u>

84.    While petitioners are generally required to exhaust administrative remedies to seek a writ of habeas corpus pursuant to § 2241, this exhaustion requirement is non-jurisdictional. *Santiago-Lugo v. Warden*, 785 F.3d 467, 475 (11th Cir. 2015).

85.    The BOP has a four-step procedural remedy requirement: (1) informal resolution (BP-8); (2) formal written Administrative Remedy Request (BP-9) at the institutional level; (3) appeal to the BOP Regional Director (BP-10); and (4) appeal to BOP General Counsel (BP-11). 28 C.F.R. § 542.10-542.16; *Meriweather v.*

26

*Augustine*, No. 5:11cv118/MCR/EMT, 2012 WL 2049484, 2012 U.S. Dist. LEXIS 77643, at *5–6 (N.D. Fla. Apr. 30, 2012).

86.     Mr. Harris has exhausted all four levels of available administrative remedies, so this court has jurisdiction to hear his petition.

87.     On November 21, 2024, Mr. Harris filed a BP-8—an informal resolution method within FPC Montgomery. On December 6, 2024, FPC Montgomery rejected the informal resolution and issued Mr. Harris a BP-9. Ex. 14.

88.     On December 9, 2024, Mr. Harris filed a written BP-9 Request for Administrative Remedy, appealing FPC Montgomery's denial and requesting that FPC Montgomery contact the entity responsible for calculating his FSA credits. On December 16, 2024, FPC Montgomery denied Mr. Harris's request with a response "for informational purposes only," and notified Mr. Harris that he could file a BP-10 to the regional BOP director. Ex. 14.

89.     On January 3, 2025, Mr. Harris timely filed a BP-10 Regional Administrative Remedy Appeal to the BOP's Regional Director. The Regional Director denied his appeal, stating that Mr. Harris was not eligible to earn credits while in transit and because he declined to participate in a "required" inmate program Ex. 15.

90.     On February 24, 2025, Mr. Harris timely filed a BP-11 Appeal to the General Counsel with the BOP's Central Office's Administrator of National Inmate Appeals ("Central Office"). Ex. 16. On April 8, 2025, the Central Office erroneously responded to Mr. Harris, misidentifying Mr. Harris's appeal and issuing an

27

erroneous BP-11 response presumably intended for another inmate. Ex. 17 (BP-11 Response). The erroneous BP-11 response stated that the petitioner had been denied admission into the Medication Assisted Treatment (MAT) program, which is reserved for inmates with severe narcotic histories and narcotic additions. *Id.* at 3. Mr. Harris does not have any such history. Months later and after concerted efforts by Mr. Harris, the Central Office eventually issued a corrected decision, denying his appeal on substantially the same grounds as cited by the Regional Director. (Inexplicably, the Central Office's corrected decision is marked with the same date as the erroneous decision). *Id.* at 9.

91.     Completion of these four steps satisfied Mr. Harris's exhaustion requirement. *See Meriweather*, 2012 WL 2049484, 2012 U.S. Dist. LEXIS 77643, at *5–6.

92.     There are no further administrative remedies available to Mr. Harris.

93.     Furthermore, to the extent that Mr. Harris's requested relief was not raised through the administrative process, the Supreme Court has clarified that exhaustion requirements should not be applied if pursuing remedies through the administrative process is futile. *See Ross v. Blake*, 578 U.S. 632, 636 (2016).

94.     In the case at bar, further pursuing any additional administrative remedy is futile because the BOP has demonstrated a predetermined position of defying the FSA through systematic non-compliance with the FSA and federal court decisions. *Woodford v. Ngo*, 548 U.S. 81. 103–04 (2006) (Breyer, J., concurring) (exhaustion exceptions include futility, inadequate or unavailable remedies).

28

95.     It would result in irreparable harm to require Mr. Harris to further attempt to exhaust remedies when exhaustion is futile. *See United States v. Basciano*, 369 F. Supp. 2d 344, 348 (E.D.N.Y. 2005) (A court may excuse exhaustion if "administrative appeal would be futile, or because the appeals process is shown to be inadequate to prevent irreparable harm to the defendant.").

96.     Lastly, multiple circuits have recognized that even prudential exhaustion requirements must yield in cases like this one where the challenge involves statutory interpretation rather than factual disputes. *Geiger v. United States*, 502 F.2d 1290, 1292–93 (8th Cir. 1974); *Garza v. Davis*, 596 F.3d 1198, 1203–04 (10th Cir. 2010); *Elwood v. Jeter*, 368 F.3d 842, 844 n.1 (8th Cir. 2004).

B.     Mr. Harris's Lawsuit Is Ripe for Court Review

97.     Ripeness "is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies.'" *Temple B'Nai Zion, Inc. v. City of Sunny Isles Beach*, 727 F.3d 1349, 1356 (11th Cir. 2013) (quoting *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 807 (2003)). A matter is ripe when "an administrative decision has been formalized and its effects [are] felt in a concrete way by the challenging parties." *Id.* (quoting *Konikov v. Orange Cnty.*, 410 F.3d 1317, 1322 (11th Cir. 2005) (per curiam)).

98.     The BOP's misinterpretation of the FSA has concretely affected Mr. Harris such that this matter is ripe for review.

29

99.    First, the BOP has unlawfully disallowed programming days for Mr. Harris based on inapposite factors. Mr. Harris has already completed these programming days, but the BOP has declined to apply any of those credits towards his release date or early transfer to prerelease custody. Because Mr. Harris has already exhausted his administrative remedies in challenging the BOP's denial, the BOP has definitively determined that he is unable to earn or apply these credits.

100.    Second, the BOP has erroneously projected the maximum FSA credits Mr. Harris can earn throughout his incarceration within the FSA Time Credit Assessment Sheet. These projections directly contravene the FSA by miscalculating Mr. Harris's earned time credits and foreclosing the ability of Mr. Harris to earn or apply credits for any programming completed during his time in prerelease custody.

101.    The projections provided in the FSA time credit assessment sheet have present and concrete effects on Mr. Harris.

102.    Mr. Harris is currently on the waiting list to participate in the Residential Drug Abuse Program ("RDAP"), a program which takes nine to twelve months to complete.

103.    Upon completion, Mr. Harris would earn one year off his sentence.

104.    However, inmates on the waiting list are selected for participation in the program based exclusively on their projected FSA Conditional Placement Date.

105.    If Mr. Harris's dates are not adjusted to comply with the FSA, Mr. Harris will not be permitted to begin his RDAP treatment program until it is too late to receive the statutory benefit of participating in the treatment program.

30

106.   Mr. Harris should benefit from the RDAP treatment program as well as the year reduction in his sentence.

## CLAIMS FOR RELIEF

### *First Claim for Relief*
### Habeas Corpus

107.   As set forth above, the BOP is holding Mr. Harris in federal custody and depriving Mr. Harris of statutory earned time credits, which directly affect the execution of Mr. Harris's sentence.

108.   Prisoners may bring a writ of habeas corpus under 28 U.S.C. § 2241 when the execution of their sentence is in violation of the Constitution or statute. *See Antonelli v. Warden, U.S.P. Atlanta*, 542 F.3d 1348, 1352 (11th Cir. 2008).

109.   The First, Second, and Eleventh Circuits have recognized that challenges to place or type of confinement are cognizable under habeas as execution-of-sentence claims. *See Francis v. Maloney*, 798 F.3d 33, 36 (1st Cir. 2015); *Levine v. Apker*, 455 F.3d 71, 78 (2d Cir. 2006) (quoting *Jiminian v. Nash*, 245 F.3d 144, 146 (2d Cir. 2001)); *United States v. Saldana*, 273 F. App'x 845, 846 (11th Cir. 2008).

110.   Since the FSA's enactment, district courts in the Eleventh Circuit have treated these claims as cognizable under § 2241. *See, e.g.*, *Woolsey v. Washington*, No. 2:25-CV-137-WKW, 2025 WL 2598794, at *25 (M.D. Ala. Sept. 8, 2025); *Sharma*, 756 F. Supp. 3dat 1274.

111.   Properly calculated, Mr. Harris's FSA conditional placement date is May 20, 2028, and his eligible prerelease date along with stacked SCA time is May 20, 2027—one and a half years earlier than the BOP's erroneous calculations.

31

112.    If Mr. Harris completes RDAP, his conditional release date will move up even earlier. However, his conditional placement date determines his spot on the RDAP waiting list.

113.    Accordingly, Mr. Harris seeks a writ of habeas corpus compelling the BOP to accurately recalculate and project his earned credits to ensure his placement in prerelease custody and early release comport with the FSA.

### Second Claim for Relief
### Violation of the First Step Act, 18 U.S.C. §§ 3624(g)(i)(A)–(c), 3632(d)(4)(C)

114.    The FSA directs that the BOP (a) "shall" award earned time credits to eligible prisoners who participate in qualifying programs and are determined to have low recidivism risk, 18 U.S.C. § 3632(d)(4)(A)(i)–(ii); (b) "shall" provide earned time credits in addition to any other incentives for which people are eligible, 18 U.S.C. § 3632(d)(6); and (c) "shall" move people who meet certain qualifications into prerelease custody when their credits are equal to the time remaining on their sentences, 18 U.S.C. § 3624(g)(1)(A)–(C).

115.    The FSA does not give the BOP discretion to withhold credits from prisoners who meet the eligibility requirements for any reason, including while the prisoner is in transit between locations of confinement or allegedly in default of restitution payments.

116.    The BOP erroneously failed to award a total of 72 program days on the basis that Mr. Harris was "not in qualifying admit status" while he was in transit. *See* Ex. 3.

117.    The BOP erroneously failed to award a total of 68 program days on the

basis that Petitioner was allegedly in default on his restitution payments. *See* Ex. 3.

118. The BOP withheld credits from Mr. Harris during periods when he met the eligibility requirements and failed to award the full number of credits for which Petitioner was eligible.

119. The BOP violated the FSA when it failed to award Mr. Harris's earned time credits that he was eligible to earn.

120. The FSA's plain language does not distinguish between prisoners in a brick-and-mortar prison and those in prerelease custody for purposes of eligibility for earned time credits.

121. The BOP should award earned time credits to eligible prisoners who are in prerelease custody.

122. The BOP projects that prisoners will earn credits while in prerelease custody, in accordance with the FSA.

123. But the BOP violated the FSA and Mr. Harris's rights when it failed to correctly project the number of earned time credits Petitioner is likely to earn in prerelease custody.

124. The BOP further violated the FSA when it failed to apply Mr. Harris's projected credits to his FSA Conditional Placement date, rendering earned time credits he will earn while in prerelease custody functionally worthless.

125. As a result of the BOP's statutory violations, Mr. Harris faces the irreparable harm of unlawful over-detention in an institutional setting.

### *Third Claim for Relief*
### Due Process Violation

126.   The Fifth and Fourteenth Amendments of the U.S. Constitution prohibit the government from depriving citizens of life, liberty, or property without due process of law. U.S. Const. amend. V; U.S. Const. amend. XIV.

127.   Though a prisoner's due process rights may be diminished, "a prisoner is not wholly stripped of constitutional protections when he is imprisoned for crime." *Wolff v. McDonnell*, 418 U.S. 539, 555–56 (1974).

128.   The Supreme Court has recognized that prisoners have a protected liberty interest in statute-created rights, including earned time credits of which a person may be deprived *only* as a "sanction authorized for major misconduct." *Wolff v. McDonnell*, 418 U.S. 539, 556–57 (1974).

129.   Similarly, a prisoner's right to due process is violated when the prisoner is deprived of a liberty interest of real substance, which includes a liberty interest in a shortened prison sentence. *Sandin v. Conner*, 515 U.S. 472, 477–78 (1995).

130.   The FSA created a protected liberty interest in the FSA's earned time credits, which requires the BOP to credit to eligible persons and prohibits the BOP from withholding from eligible persons.

131.   The FSA likewise created a liberty interest of real substance in a shorter prison sentence and shortened time in an institutional setting by statutorily guaranteeing eligible prisoners the right to placement in prerelease custody and supervised release based on those earned time credits, a liberty interest which the

34

statute does not permit the BOP to deny.

132. The BOP violated Mr. Harris's due process rights when it improperly withheld his earned time credits.

133. The BOP violated Mr. Harris's due process rights when it failed to properly calculate and award his earned time credits.

134. The BOP violated Mr. Harris's due process rights when it failed to properly project and apply earned time credits Mr. Harris will earn while in prerelease custody to his FSA Conditional Placement Date.

135. As a result of the BOP's violations, Mr. Harris faces irreparable harm to his substantive liberty interest in a shortened prison sentence and shortened time in an institutional prison setting.

### *Fourth Claim for Relief*
### Equal Protection Violation

136. Although the Fifth Amendment does not contain an equal protection clause, "it does forbid discrimination that is so unjustifiable as to be violative of due process," and so "a classification that is invalid under the Equal Protection Clause of the Fourteenth Amendment . . . is also invalid under the Due Process Clause of the Fifth Amendment." *Jackson v. State Bd. of Pardons & Paroles*, 331 F.3d 790, 792 n.1 (11th Cir. 2003) (quoting *United States v. Perez-Hernandez*, 672 F.2d 1380, 1385 (11th Cir. 1982) (alterations omitted)).

137. "[T]o plead an equal protection claim, a plaintiff must allege that 'through state action, similarly situated persons have been treated disparately.'" *Bumpus v. Watts*, 448 F. App'x 3, 6 (11th Cir. 2011) (quoting *Thigpen v. Bibb Cnty.,*

35

*Ga., Sheriff's Dep't*, 223 F.3d 1231, 1237 (11th Cir. 2000)).

138. "Equal protection claims are not limited to individuals discriminated against based on their membership in a vulnerable class." *Campbell v. Rainbow City*, 434 F.3d 1306, 1313 (11th Cir. 2006).

139. A "class-of-one" equal protection claim can arise when a plaintiff is "intentionally treated differently from others similarly situated" without a rational basis. *Bumpus*, 448 F. App'x at 6 (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).

140. "Class-of-one" claims do not require a showing of ill will or discriminatory purpose. *Campbell*, 434 F.3d at 1314.

141. To be similarly situated, comparators must be "prima facie identical in all relevant respects." *Grider v. City of Auburn*, 618 F.3d 1240, 1264 (11th Cir. 2010) (quoting *Griffin Indus. v. Irvin*, 496 F.3d 1189, 1202 (2007)).

142. The BOP intentionally awards earned time credits to prisoners with shorter sentences differently than to prisoners with longer sentences.

143. Mr. Harris is similar to the proposed comparators in all relevant respects, including eligibility criteria, program participation, risk scores, and timing of accrual of credits.

144. The BOP routinely awards earned time credits to prisoners with shorter sentences while they are in prerelease custody and applies those earned time credits to early supervised release.

145. By contrast, the BOP's calculation of Mr. Harris's earned time credits

36

fails to meaningfully apply those credits toward early placement in prerelease custody, since the BOP has already credited 365 of Mr. Harris's time credits toward supervised release.

146. In addition, the BOP's failure to properly project and apply projected FSA credits toward Mr. Harris's placement in prerelease custody renders any credits that he will earn in prerelease custody worthless.

147. In other words, the BOP's failure to treat Mr. Harris equally to similarly situated prisoners deprives him of the right to earn time credits in prerelease custody.

148. The BOP's failure to treat Mr. Harris equally to similarly situated prisoners also deprives him of the FSA's benefits and incentives to participate in eligible anti-recidivism programming and other activities that will facilitate his successful reintegration upon release.

149. The BOP cannot establish a rational basis for this unequal treatment, which violates the FSA's language and intent.

150. As a result of the BOP's arbitrary unequal treatment, Mr. Harris faces the irreparable harm of unlawful incarceration, while other similarly situated prisoners receive the FSA's full benefits.

## CONCLUSION

151. The BOP has failed to credit Mr. Harris with the full number of his statutorily mandated FSA credits. Mr. Harris is entitled to have all of his FSA credits projected and applied during each stage of his sentence, including days that are spent in prerelease custody.

WHEREFORE, Mr. Harris prays that this Court:

(a)    accept his Petition without requiring Mr. Harris to attempt any further futile exhaustion of his administrative remedies and confirm that the erroneous BP-11 response has been expunged from Mr. Harris's record,

(b)    issue an expedited scheduling order for Respondent to file an Amended Answer,

(c)    order Respondent to restore the 140 days that have been unlawfully disallowed and prohibit Respondent from disallowing in-transit or FRP refusal days in the future,

(d)    order Respondent to credit Mr. Harris with an additional 17 days of FSA credit for previously restored days based on Mr. Harris's eligibility pursuant to 18 U.S.C. § 3632(d)(4)(A)(ii),

(e)    project all FSA credits until Mr. Harris's entire sentence is completed and apply those credits to early prerelease custody as required by law, and,

(f)    grant all other relief to which Mr. Harris is entitled.

Dated: January 29, 2026

Respectfully Submitted,

s/ *Maxwell E. Hamilton*
Theresa Wardon Benz (CO Bar No. 41510)
Maxwell E. Hamilton (CO Bar No. 55521)
Caitlin Dacus (CO Bar No. 60814)
Davis Graham & Stubbs LLP
3400 Walnut Street, Suite 700
Denver, Colorado 80202
Tel: (303) 892-9400
theresa.benz@davisgraham.com
max.hamilton@davisgraham.com
caitlin.dacus@davisgraham.com

*Attorneys for Petitioner Bradley Harris*

## CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of January, 2026, a true and correct copy of the foregoing was filed with the Clerk of Court using the CM/ECF system which will send notification to the following:

**James Joseph DuBois**
**MaryLou E. Bowdre**
U. S. Attorney's Office
PO Box 197
Montgomery, AL 36101
334-223-7280
Fax: 334-223-7418
james.dubois2@usdoj.gov
marylou.bowdre@usdoj.gov


*Attorneys for Respondent*


*s/   Seth Clark*
Seth Clark