IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| BRADLEY HARRIS,<br>Reg. No. 55436-177,<br><br>Petitioner,<br><br>v.<br><br>RAY COLEMAN,[1]<br><br>Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE NO. 2:25-CV-254-WKW<br>[WO] |

**MEMORANDUM OPINION AND ORDER**

## I. INTRODUCTION

Petitioner Bradley Harris, an inmate in the custody of the Federal Bureau of Prisons (BOP), filed a *pro se* petition for writ of habeas corpus under 28 U.S.C. § 2241 on March 27, 2025. (Doc. # 1.) At the time of filing, he was in custody at the Federal Prison Camp in Montgomery, Alabama (FPC-Montgomery), where he remains in custody. Several events ensued after the filing of this petition, including a stay of this civil action due to a lapse of federal appropriations (Doc. # 23), retention of counsel (Docs. # 19, 29), and an extension of the deadline for filing an amended petition (Doc. # 27).

[1] Petitioner originally named Milton Washington, who now is the former warden of the Federal Prison Camp in Montgomery, Alabama. The current acting warden is Ray Coleman. Accordingly, the electronic docket sheet will be updated to reflect Ray Coleman as Respondent.

On January 29, 2026, represented by counsel, Petitioner filed the operative amended petition for a writ of habeas corpus under 28 U.S.C. § 2241, alleging that the BOP unlawfully misapplied the First Step Act of 2018 (FSA), Pub. L. No. 115-391, 132 Stat. 5194 (Dec. 21, 2018), including by miscalculating his accumulated and projected FSA time credits under 18 U.S.C. §§ 3632(d)(4)(C) and 3624(g)(1)(A)–(C). He further alleges that these statutory violations deprived him of due process and equal protection rights protected by the Fifth Amendment to the United States Constitution. (Doc. # 30.) In substance, Petitioner alleges that the BOP improperly disallowed him the opportunity to earn FSA time credits during periods while he was in transit between BOP facilities and during periods when the BOP placed him in "refusal" status for failing to pay restitution through the Inmate Financial Responsibility Program. He further alleges that the BOP failed to apply the enhanced 15-day credit rate, instead crediting him at the 10-day rate. Finally, although he acknowledges he is not presently eligible for prerelease custody, Petitioner asserts that the BOP also miscalculated his projected prerelease placement date by failing to account, at the outset, for future time credits he could earn while in prerelease custody and that correcting this error would advance his prerelease-custody placement. (Doc. # 30.)

Respondent, who is named in his official capacity as the warden of FPC-Montgomery (Doc. # 30 at 1), filed an answer to the § 2241 amended petition. (Doc.

# 36.) He requests dismissal of Petitioner's federal statutory and constitutional claims for lack of subject matter jurisdiction and, alternatively, for failure to state a claim. His arguments for failure to state a claim focus on two asserted pleading deficiencies: The due process claim does not allege a protected liberty interest, and the equal protection claim does not allege a similarly situated comparator. (Doc. # 36.) Thereafter, Petitioner filed a reply as directed. (Docs. # 37, 39, 40.)

For the reasons explained below, Respondent's jurisdictional argument, which is that the petition is not ripe, is dispositive. Alternatively, the petition cannot go forward because Petitioner has failed to state a claim. Accordingly, the petition will be analyzed under the standards applicable to motions under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).[2] An evidentiary hearing is not necessary. *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts*[3] [hereinafter *Rules Governing § 2254 Cases*].

[2] Under Rule 12 of the *Rules Governing Section 2254 Cases in the United States District Courts*, the Federal Rules of Civil Procedure may be applied to the extent that they are not inconsistent with any statutory provisions or the *Rules*. *See Rodriguez v. Fla. Dep't of Corr.*, 748 F.3d 1073, 1075 (11th Cir. 2014) (observing that courts may supplement the *Rules Governing § 2254 Cases* with the Federal Rules of Civil Procedure when not inconsistent (citing Rule 12, *Rules Governing § 2254 Cases*)). Here, application of Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) presents no such inconsistency.

[3] The *Rules Governing § 2254 Cases* apply to petitions under 28 U.S.C. § 2241. *See* Rule 1(b), *Rules Governing § 2254 Cases* (providing that the *Rules* apply to habeas corpus petitions filed under provisions other than § 2254).

## II. JURISDICTION

A writ of habeas corpus may be granted to a federal prisoner who shows that he is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). Section 2241(a) grants jurisdiction to the district court to provide habeas relief when the prisoner is confined within its district at the time the petition is filed. *See Rumsfeld v. Padilla*, 542 U.S. 426, 434 n.7 (2004) ("The word 'jurisdiction,' of course, is capable of different interpretations. We use it in the sense that it is used in the habeas statute, 28 U.S.C. § 2241(a), and not in the sense of subject-matter jurisdiction of the District Court."); *see also Fernandez v. United States*, 941 F.2d 1488, 1495 (11th Cir. 1991) ("Section 2241 petitions may be brought only in the district court for the district in which the inmate is incarcerated."). Respondent does not contest this statutory grant of jurisdiction; however, he argues that subject matter jurisdiction is lacking because Petitioner's petition is not ripe. *See generally Rumsfeld*, 542 U.S. at 434 n.7 (referring to jurisdiction "in the sense that it is used in the habeas statute, 28 U.S.C. § 2241(a), and not in the sense of subject-matter jurisdiction of the District Court"). This jurisdictional issue is addressed below.

## III. STANDARDS OF REVIEW

Under Rule 12(b)(1), challenges to subject matter jurisdiction can be either facial or factual. *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271,

1279 (11th Cir. 2009). A facial attack contests subject matter jurisdiction based on (1) the petition alone, with the non-conclusory allegations accepted as true, or (2) the petition "supplemented by undisputed facts evidenced in the record." *McElmurray v. Consol. Gov't of Augusta-Richmond Cnty.*, 501 F.3d 1244, 1251 (11th Cir. 2007); *see also Ikhine v. Nielsen*, 2018 WL 11446850, at *1 (N.D. Ga. Aug. 21, 2018) (explaining that because the court was "considering only 'the complaint supplemented by undisputed facts evidenced in the record,'" the challenge to "subject matter jurisdiction remain[ed] a facial, as opposed to a factual, attack" (citing *McElmurray*, 501 F.3d at 1251)). Here, Respondent's jurisdictional challenge will be treated as a facial attack.

When the challenge is a facial attack, the court "accept[s] the well-pleaded factual allegations in the complaint as true." *Lawrence v. United States*, 597 F. App'x 599, 602 (11th Cir. 2015) (per curiam). However, the court is "not required to accept mere conclusory allegations as true, nor [is it] required to accept as true allegations in the complaint that are contrary to factual details presented in the exhibits." *Id.* "Rather, 'when the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern.'" *Id.* (quoting *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1206 (11th Cir. 2007)); *see also City of Pembroke Pines v. Fed. Emergency Mgmt. Agency*, 494 F. Supp. 3d 1272, 1282 (S.D. Fla. 2020)

(finding that a complaint "must contain sufficient non-conclusory allegations to create a plausible inference that subject matter jurisdiction exists").

To withstand Rule 12(b)(6) scrutiny, the petition "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In evaluating plausibility, the court also may consider exhibits attached to the petition, which are treated as part of the pleading for purposes of Rule 12(b)(6). *See Hoefling v. City of Miami*, 811 F.3d 1271, 1277 (11th Cir. 2016). The court also may consider "a document attached to a motion to dismiss without converting the motion into one for summary judgment if the attached document is (1) central to the [petitioner's] claim and (2) undisputed[,]" meaning that "the authenticity of the document is not challenged." *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005) (citation omitted); *see also Walsh v. Boncher*, 652 F. Supp. 3d 161, 165 (D. Mass. 2023) (considering an undisputed BOP declaration and accompanying records at the motion-to-dismiss stage).

## IV. BACKGROUND

In March 2021, Petitioner pleaded guilty to charges of healthcare fraud and conspiracy to commit healthcare fraud. In January 2022, he was sentenced to 159 months' imprisonment, followed by a three-year term of supervised release, and was ordered to pay $27,594,875.52 in restitution. *See United States v. Harris*, No. 3:17-

CR-00103 (N.D. Tex. Feb. 23, 2017), ECF Nos. 937, 1361. Petitioner was committed to federal prison on February 22, 2022. (Doc. # 30 at 2.)

The § 2241 petition challenges the BOP's calculation, application, and projection of time credits under the FSA (FTCs) and, specifically, how those FTCs affect Petitioner's eligibility for prerelease custody.[4] To frame the issues, a brief overview of the relevant statutory framework is provided below, followed by a summary of the tools used by the BOP to calculate FTCs, determine prerelease-custody eligibility, and project release dates.

## A. <u>Statutory Framework</u>

Petitioner's claims arise under the FSA, but his arguments also touch on the Second Chance Act (SCA).[5] Petitioner is clear, however, that he is not challenging "the BOP's SCA-related decisions." (Doc. # 40 at 4.) Even so, a short discussion of how the FSA's time-credit framework interacts with the SCA provides useful context for the relief Petitioner seeks and the BOP's placement determinations.

The SCA, as codified in relevant part at 18 U.S.C. § 3624(c), predates the FSA and established the initial mechanism for prerelease custody for federal prisoners.

---

[4] Time credits will be referred to as "FTCs," consistent with BOP's usage in the documents submitted by Respondent.

[5] The FSA reauthorized the Second Chance Act of 2007, Pub. L. 110-199 (Apr. 9, 2008), codified at 34 U.S.C. § 60501 *et seq.*, and added incentives for eligible prisoners to earn earlier placement in prerelease custody. *See Beckford v. Warden, FCI Atlanta*, 2025 WL 4739999, at *1 n.2 (N.D. Ga. June 6, 2025), *R&R adopted*, 2025 WL 4740044 (N.D. Ga. Sept. 19, 2025).

Under § 3624(c)(1), the BOP may place a prisoner in prerelease custody, including placement in a "community correctional facility," for up to 12 months before the end of the prisoner's sentence. A prisoner also may be placed in home confinement not to exceed "the shorter of 10 percent of the term of imprisonment . . . or 6 months." § 3624(c)(2). But the SCA neither requires nor guarantees 12 months in prerelease custody because the language of § 3624(c) is discretionary, not mandatory. *See* § 3624(c) ("The Director of the [BOP] shall, to the extent practicable," § 3624(c)(1); "[s]uch conditions may include a community correctional facility," *id.*; "[t]he authority under this subsection may be used to place a prisoner in home confinement," § 3624(c)(2); "[t]he [BOP] shall, to the extent practicable," *id.*).

In 2018, Congress passed the FSA. *See* Pub. L. No. 115-391, 132 Stat. 5194 (2018) (codified at 18 U.S.C. §§ 3621, 3624, 3631–35). The FSA built upon the SCA by allowing FTCs to extend prerelease custody beyond the SCA's statutory limits. *See* 18 U.S.C. §§ 3624(g)(10), 3632(d)(4)(C). The FSA required the BOP developed a "risk and needs assessment system" for prisoners to "provide incentives and rewards for successful participation in evidence-based recidivism reduction [EBRR] programs or productive activities [PAs]." 18 U.S.C. § 3632(a)(6). To implement this mandate, the BOP created the Prisoner Assessment Tool Targeting Estimated Risk and Needs (PATTERN). PATTERN assesses each prisoner's risk of recidivism and assigns a risk score of minimum, low, medium, or high. Prisoners

earn 10 days of time credit for every 30 days of successful program participation. § 3632(d)(4)(A)(i); *see also Woolsey v. Washington*, 2025 WL 2598794, at *5 (M.D. Ala. Sept. 8, 2025) (describing PATTERN). Additionally, prisoners determined by the BOP "to be at a minimum or low risk for recidivating, who, over 2 consecutive assessments, ha[ve] not increased their risk of recidivism, shall earn an additional 5 days of time credits for every 30 days of successful participation in evidence-based recidivism reduction programming or productive activities." § 3632(d)(4)(A)(ii). Each credit constitutes one FTC and is equivalent to one day. *See* § 3632(d)(4)(A).

FTCs are applied to accelerate a prisoner's transfer either to prerelease custody, which includes residential reentry centers (RRCs) and home confinement, or to supervised release if such a term has been imposed. *See* § 3624(g); *see also* § 3632(d)(4)(C) (titled, "Application of time credits toward prerelease custody or supervised release"). Section 3624(g) sets forth the requirements "eligible prisoners" must satisfy to have FTCs applied toward early transfer to prerelease custody or supervised release.

The first requirement is central to Respondent's ripeness argument; it provides that "eligible prisoners" must have earned FTCs "in an amount that is equal to the remainder of the prisoner's imposed term of imprisonment." § 3624(g)(1)(A). Second, the prisoner must have "shown through the periodic risk reassessments a demonstrated recidivism risk reduction" or have "maintained a minimum or low

recidivism risk" during imprisonment. § 3624(g)(1)(B). Third, the prisoner's remaining sentence must have been computed "under applicable law." § 3624(g)(1)(C). Fourth, for placement in prerelease custody, the prisoner must have a minimum or low recidivism risk score in the last two reassessments or have a petition approved by the warden. *See* § 3624(g)(1)(D)(i). Fifth, for placement in supervised release, the prisoner must have been assessed as a minimum or low risk to recidivate in the last reassessment. § 3624(g)(1)(D)(ii). FTCs also can be revoked as a sanction for disciplinary infractions. (*See* Doc. # 30-1 at 10); 28 C.F.R. § 523.43(a) (providing that a prisoner can forfeit FTCs "for violation of the requirements or rules of an EBRR Program or PA").

Where a prisoner is subject to a term of supervised release, the FSA permits application of no more than 365 days (365 FTCs) toward a sentence reduction. § 3624(g)(3) ("[T]he Director of the [BOP] may transfer the prisoner to begin any such term of supervised release at an earlier date, not to exceed 12 months, based on the application of time credits under section 3632."). In *Guerriero v. Miami* RRM, the Eleventh Circuit confirmed the scope of § 3624(g)(3) by affirming the district court's decision that the BOP had "applied the maximum 12 months' worth of [FTCs] allowed by the FSA to begin [the petitioner's] term of supervised release." 2024 WL 2017730, at *1 (11th Cir. May 7, 2024) (per curiam); *see also Rivera-Perez v. Stover*, 171 F.4th 196, 210 (2d Cir. 2026) (holding that FTCs can be applied

to accelerate the start of supervised release but "[t]hey do not reduce a post-incarceration term of supervised release"). Additional FTCs are to be applied to prerelease custody. *See* § 3632(d)(4)(C). However, unlike early placement on supervised release, the FSA does not impose a numerical cap on the number of FTCs that can be applied toward placement in prerelease custody. The date of a referral to prerelease custody also can be affected by the number of discretionary days granted under the SCA. (*See, e.g.*, Doc # 36-1 at 14 ("SCA days are not guaranteed and require an individualized assessment!" (all caps omitted)).)

## B. <u>The BOP's Projection Tool</u>

The BOP uses a projection tool to estimate a prisoner's release dates, both to prerelease custody and supervised release. The tool generates updated, individualized projections each month and includes those projections in the prisoner's FSA Time Credit Assessment. For Petitioner, the most recent FSA Time Credit Assessment in the record is dated March 24, 2026. (Doc. # 36-1 at 12–14; Doc. # 40-1 at 2–4.) The projections for Petitioner, as well as relevant definitions, are as follows:

(1) **Projected Release Date**: May 19, 2033. (Doc. # 36-1 at 14.) The projected release date is the date a prisoner is expected to be released, before any FTCs or SCA time are applied but after projected good conduct time credits are taken into account. (Doc. # 30 at 8; Doc. # 30-4 at 6.)

(2) **FSA Projected Release Date**: May 19, 2032.[6] (*See* Doc. # 36-1 at 14.) The FSA Projected Release Date is the date on which a prisoner may become eligible for supervised release after the first 365 FTCs are applied. After a prisoner earns 365 FTCs, this date will not change. (Doc. # 30-4 at 6; *see also* Doc. # 30 at 8.)

(3) **FSA Conditional Release Date**: May 19, 2032. (*See* Doc. # 36-1 at 14.) The FSA Conditional Release Date represents "the maximum number of FTCs an inmate can earn and apply towards [his] release." (Doc. # 30-4 at 6.) "Changes in this date occur due to changes in the inmate's status including earning rate, opt in status, admission status and disciplinary segregation." (Doc. # 30-4 at 6.) "The FSA Conditional Release Date will equal the FSA Projected Release date once the inmate has earned 365 FTCs toward early release." (Doc. # 30-4 at 6.)

(4) **FSA Conditional Placement Days**: 935. (*See* Doc. # 36-1 at 14.) This figure reflects the maximum number of FTCs an FSA-eligible inmate may earn toward prerelease custody (RRC or home confinement) based on the inmate's current PATTERN risk level and earning status. It includes (i) FTCs earned in excess of 365, plus (ii) any assumed FTCs the inmate

[6] The May 19, 2032 projected release date also appears on the Inmate Locator website maintained by the BOP. *See Find an Inmate*, Fed. Bureau of Prisons, https://www.bop.gov/inmateloc/ (last visited Aug. 19, 2026).

would earn until the FSA Conditional Release Date. This figure may change if the prisoner's status changes, including changes to earning rate, opt-in status, admission status, or disciplinary segregation. (Doc. # 30-4 at 8.)

(5) **FSA Conditional Placement Date**: October 27, 2029. (*See* Doc. # 36-1 at 14.) The FSA Conditional Placement Date reflects the date an inmate "may become eligible for prerelease custody once [FTCs], in excess of 365 [FTCs], are applied." (Doc. # 30 at 8–9; Doc. # 30-4 at 8.)

(6) **Conditional Transition to Community Date**: November 1, 2028. (*See* Doc. # 36-1 at 14.) This date represents the earliest point at which a prisoner may transition to the community based on both the FSA Conditional Placement Date and the number of recommended SCA days. (Doc. # 30-4 at 9.)

## C. Petitioner's Claims and Respondent's Answer

### 1. *Allegations*

Based on the BOP's projections, Petitioner contends that the BOP "misapplied the FSA and failed to properly calculate accumulated and projected FSA days" as set forth below. (Doc. # 30 at 9.) He alleges that the BOP unlawfully withheld FTCs that were to be calculated based on 140 program days. First, he contends that the BOP improperly placed him in non-earning status for 72 days while he was in transit

between BOP facilities. (Doc. # 30 at 12–13; Doc. # 30-5 at 2–3.) Second, he contends that the BOP improperly withheld FTCs for 133 program days during which it deemed him in "refusal" status for failing to make restitution payments under the Inmate Financial Responsibility Program (IFRP). (Doc. # 30 at 13.) Although the BOP later credited Petitioner with 65 program days previously withheld due to a clerical error in calculating IFRP refusal dates, its revised calculations still failed to credit the additional 68 program days, which remain designated as "disallowed."[7] (Doc. # 30 at 13.) Accordingly, the dispute concerns 68 program days plus an additional 72 program days, for a total of 140 disallowed program days. (Doc. # 30 at 13; *see also* Doc. # 36-1 at 12 (Petitioner's March 24, 2026 FSA Time Credit Assessment documenting 140 "disallowed" program days).)

Petitioner also challenges the ratio the BOP used to award FTCs for the 65 days it later credited, asserting that the proper ratio is 1:2 rather than 1:3. He maintains that he has consistently met the minimum/low-risk requirement for

---

[7] The relationship between IFRP and FTCs is explained in *Vargas v. Rivers*, 2025 WL 1380067 (5th Cir. 2025) (per curiam). The IFRP, governed by 28 C.F.R. § 545.11, helps prisoners develop a plan to satisfy financial obligations, including court-ordered restitution. The FSA provides FTCs for completing qualifying EBRR programs or PAs, and the BOP has designated IFRP participation as a PA. Prisoners can earn FTCs through IFRP participation but, under BOP regulation, also are prevented from earning FTCs prospectively during IFRP "refusal status." *See Vargas*, 2025 WL 1380067, at *1; *see also Brennerman v. Warden, FCI-Allenwood Low*, 2025 WL 52469, at *2 (M.D. Pa. Jan. 8, 2025) (noting that the BOP disallowed FSA program days because the petitioner "was in 'refusal status'" under the IFRP and further noting that, "[a]lthough the program is voluntary, if an inmate refuses to participate in the program, 'the inmate will not earn [time credits]'").

earning FTCs, yet the BOP's restoration of 65 previously "disallowed" program days increased his FSA Conditional Placement Days by only 15 days (from 920 to 935 days). He contends this discrepancy demonstrates that the BOP continues to miscalculate his FTCs by failing to award the required 15 days of credit for every 30 days of eligible programs under 18 U.S.C. § 3632(d)(4)(A)(ii). (Doc. # 30 at 15–16.)

Petitioner's § 2241 petition challenges the BOP's allegedly erroneous calculation of his FTCs and the resulting impact on his eligibility for prerelease custody. (Doc. # 30 at 9–15.) Petitioner contends that these errors stem from "the BOP's failure to properly interpret the FSA's unambiguous statutory language." (Doc. # 30 at 11 (citing §§ 3632(d)(4)(B)–(C)).) He argues that because the FSA does not distinguish between institutional confinement and prerelease custody for purposes of a prisoner earning FTCs, the BOP violates the FSA by not projecting and applying FTCs he would earn in prerelease custody to his FSA Conditional Placement Date, which he says effectively renders worthless the FTCs he would earn in prerelease custody. More specifically, Petitioner alleges that, beginning in October 2024, the BOP changed its projection method for eligibility for prerelease custody to apply FTCs only after they are actually earned. (Doc. # 30 at 23.)

Under this method, a prisoner is projected to become eligible for prerelease custody only when his or her completed FTCs equal the days remaining on the

sentence. Because the BOP also applies the first 365 FTCs to the supervised-release component before applying any credits to advance prerelease custody, the projections do not account for FTCs the prisoner could earn while in prerelease custody. As a result, prisoners lose the benefit of future FTCs in the prerelease-custody eligibility calculation because future FTCs, if counted, would advance the start date for prerelease custody. Petitioner therefore contends that the BOP's assertion that prisoners may continue earning FTCs while in prerelease custody is misleading for prisoners like him because under the new projections those FTCs generally do not yield earlier prerelease-custody placement. (Doc. # 30 at 21–24.) The BOP has answered that "[i]t is not possible . . . to retroactively apply time credits earned while in prerelease custody to effect an earlier placement in prerelease custody." (Doc. # 30 at 25 (citation and internal quotation marks omitted).)

Petitioner alleges that he exhausted his administrative remedies or, alternatively, that further pursuit of exhaustion would be futile. (Doc. # 30 at 26–29.) First, he asserts that he exhausted the BOP's administrative-remedy process for his claims seeking an award of FSA program days that were withheld while he was (1) in transit between BOP facilities and (2) in "refuse" status and that the BOP denied relief. (Doc. # 30 at 27; Doc. # 30-15.) Second, he challenges the BOP's position regarding whether FTCs earned in prerelease custody can be projected and applied to accelerate prerelease-custody placement. Although Petitioner does not

appear to have obtained a formal administrative decision on that specific issue, he alleges that the BOP provided an informal but unequivocal response. That response, which was communicated in connection with a family inquiry to a United States senator, stated that "[i]t is not possible . . . to retroactively apply time credits earned while in prerelease custody to effect an earlier placement in prerelease custody." (Doc. # 30 at 25 (citation and internal quotation marks omitted).) Respondent's answer is silent on the issue of exhaustion. Because failure to exhaust administrative remedies is not a jurisdictional prerequisite to suit under 28 U.S.C. § 2241 and absent a challenge by Respondent, the court will accept Petitioner's position. *See Santiago-Lugo v. Warden*, 785 F.3d 467, 474 (11th Cir. 2015).

**2. *Petitioner's Claims***

Based on the foregoing allegations, Petitioner brings four "claims for relief." (Doc. # 30 at 31.) The first claim is labeled "habeas corpus." (Doc. # 30 at 31.) He contends that the BOP has undercalculated his earned and projected FTCs. Petitioner contends that, properly calculated, his FSA Conditional Placement Date should be May 20, 2028 (and not October 27, 2029, as calculated by the BOP in his March 24, 2026 FSA Time Credit Assessment). (Doc. # 30 at 31–32; Doc. # 36-1 at 14; Doc. # 36-1 at 4.) He further contends that his Conditional Transition to Community Date should be May 20, 2027 (and not November 1, 2028, as calculated by the BOP on March 24, 2026). (Doc. # 30 at 24–25; Doc. # 36-1 at 14.)

Consequently, he seeks a writ of habeas corpus "compelling the BOP to accurately recalculate and project his earned credits to ensure his placement in prerelease custody and early release comport with the FSA." (Doc. # 30 at 32.)

Second, Petitioner alleges the BOP violated the FSA's earned-time-credit and prerelease-custody provisions—specifically 18 U.S.C. §§ 3624(g)(1)(A)–(C) and 3632(d)(4)(C)—by withholding and misapplying his FTCs despite his eligibility. This claim relies on the FSA's mandates that the BOP "shall" award FTCs to eligible prisoners who participate in qualifying programs and are assessed as low risk (§ 3632(d)(4)(A)(i)–(ii)), provide those FTCs in addition to other incentives (§ 3632(d)(6)), and place prisoners in prerelease custody when their FTCs equal the time remaining on their sentences (§ 3624(g)(1)(A)–(C)). Petitioner alleges the BOP improperly denied (1) 72 program days while he was in transit and (2) 68 program days for his alleged default on his restitution payments because no statutory exception bars the accrual of FTCs on these bases when a prisoner is enrolled in and participating in FSA-eligible programs. (Doc. # 30 at 32–33.)

He further contends the BOP violated the FSA by failing to determine his eligibility for placement in prerelease custody based on FTCs he would earn in prerelease custody and by failing to apply those projected credits to his FSA Conditional Placement Date, rendering his prerelease-custody FTCs functionally worthless and causing unlawful over-detention. (Doc. # 30 at 32–33.)

Third, Petitioner alleges that the BOP violated his due process rights by depriving him of a protected liberty interest in statutorily created FTCs and the resulting reduction in time spent in an institutional setting. (Doc. # 30 at 34.) Petitioner alleges the FSA creates such liberty interests by requiring the BOP to provide FTCs to eligible prisoners and by guaranteeing early placement in prerelease custody or supervised release based on those FTCs. Petitioner contends that the BOP violated due process by withholding and miscalculating FTCs and by failing to properly project and apply the FTCs he would earn during prerelease custody to his FSA Conditional Placement Date. (Doc. # 30 at 34–35.)

Fourth, Petitioner alleges the BOP has violated equal protection, as protected by the Fifth Amendment's Due Process Clause, by intentionally treating him differently from similarly situated prisoners without a rational basis (a "class-of-one" theory). He asserts that the BOP applies FTCs more favorably to prisoners with shorter sentences by crediting FTCs earned during prerelease custody toward early transfer to supervised release. By contrast, because the BOP already has applied 365 of Petitioner's FTCs toward early transfer to supervised release and does not project FTCs he would earn during prerelease custody, the latter additional FTCs do not advance his prerelease-custody placement. Petitioner contends that this unequal treatment prevents him from realizing the benefit of FTCs earned during prerelease custody and undermines the FSA's incentives without any rational basis.

(Doc. # 30 at 35–37.) "To remedy [the BOP's] flawed projection method," Petitioner "requests that the BOP project [his] eligibility for prerelease custody by including [FTCs he] is projected to earn while in prerelease custody, thus having his eligibility for prerelease custody reflect his projected accumulation of FSA time credits, assuming [he] continues to participate in eligible programming and remains in qualifying status." (Doc. # 30 at 26.)

As relief, Petitioner requests the court to (1) "order Respondent to restore the 140 days that have been unlawfully disallowed and prohibit Respondent from disallowing in-transit or FRP refusal days in the future," (2) "order Respondent to credit [Petitioner] with an additional 17 days of FSA credit for previously restored days based on [his] eligibility pursuant to 18 U.S.C. § 3632(d)(4)(A)(ii)," (3) "project all FSA credits until [Petitioner's] entire sentence is completed and apply those credits to early prerelease custody as required by law," and (4) ensure that Petitioner's record is expunged of the BOP's BP-11 response erroneously issued to Petitioner and apparently intended for another prisoner. (Doc. # 30 at 38.)

**3. *Respondent's Answer***

Respondent argues that the 28 U.S.C. § 2241 petition should be dismissed for several independent reasons. First, Respondent contends that the petition is not ripe because under Petitioner's calculations and assumptions, any prerelease eligibility date is not imminent (but about a year away) and depends on contingent future

events, including the speculative earning, loss, or application of FTCs. Respondent further maintains that Petitioner's reliance on his potential participation in a Residential Drug Abuse Program (RDAP) does not cure ripeness because RDAP placement and any sentence reduction are discretionary and not subject to judicial review. (Doc. # 36 at 3–7.)

Second, Respondent asserts Petitioner fails to state a cognizable habeas claim. According to Respondent, Petitioner already has received the maximum 365 days of FTCs that may reduce the term of imprisonment, and any additional FTCs would affect only the conditions of confinement (*i.e.*, prerelease custody placement), not the fact or duration of custody. Respondent therefore argues that the § 2241 petition falls outside the "heart of habeas corpus" but that in any event, the BOP retains exclusive authority to designate a prisoner's place of imprisonment under 18 U.S.C. § 3621(b), rendering the requested placement-related relief nonreviewable. (Doc. # 36 at 7–10.)

Third, Respondent argues that Petitioner cannot establish a due process violation because he has no protected liberty interest in the allegedly wrongfully disallowed FTCs or in a particular place of confinement. Respondent emphasizes that the BOP retains discretion over prerelease-custody placement decisions based on operational and public-safety considerations. (Doc. # 36 at 10–12.)

Fourth, Respondent contends that Petitioner's equal protection claim fails because Petitioner identifies no similarly situated comparator, is not a member of a protected class, and offers no allegations to support his "class of one" theory. Additionally, Respondent contends that the statutory framework treats prisoners uniformly by limiting sentence reductions to 365 FTCs and prohibiting application of unearned, projected credits. (Doc. # 36 at 12–13.) In sum, Respondent requests dismissal of the petition on ripeness, incognizable, and failure-to-state-a-claim grounds.

Respondent supports his position with a declaration from Spanishia Glass, a senior BOP correctional programs specialist with access to Petitioner's official confinement records. (Doc. # 36-1 at 1–5 (Decl. of Spanishia Glass).) Glass states that, consistent with BOP Program Statement 5410.01, the BOP disallowed FSA program days (and thus withheld FTCs) for periods when Petitioner was in IFRP "refusal" status (68 program days)[8] and when he was in transit between facilities (18 days from Jan. 27–Feb. 14, 2023, and 54 days from June 18–Aug. 11, 2024). (Doc. # 36-1 at 4 ¶ 21 (citing FSA Time Credit Assessment dated Mar. 24, 2026); Doc. # 36-1 at 64; Doc. # 36-1 at 5).) Glass also addresses Petitioner's claim for additional FTCs under 18 U.S.C. § 3632(d)(4)(A)(ii), explaining that his March 24,

[8] The FSA Time Credit Assessment cited by Glass reflects that 68 program days were "disallow[ed]" and includes the following notations: "declined EBRR/PA program(s)" and "REFUSE." (Doc. # 36-1 at 12.)

2026 Time Credit Assessment correctly applied the reduced 10-day credit factor (rather than 15) during his first two assessment periods, consistent with BOP policy. (Doc. # 36-1 at 5); *see also* 18 U.S.C. § 3632(d)(4)(A)(ii) (providing that "[a] prisoner determined by the Bureau of Prisons to be at a minimum or low risk for recidivating, who, over 2 consecutive assessments, has not increased [his] risk of recidivism, shall earn an additional 5 days of time credits for every 30 days of successful participation in evidence-based recidivism reduction programming or productive activities"). Glass concludes that this calculation is correct "because during the timeframe in question, [Petitioner] was still in his first 2 assessment periods." (Doc. # 36-1 at 5.) Glass's declaration further confirms the BOP's practice of applying the first 365 FTCs to advance a prisoner's projected release date to supervised release. (Doc. # 36-1 at 2, ¶ 11.)

## V. DISCUSSION

Respondent seeks dismissal of the petition on three grounds: (1) the petition is not ripe for judicial review; (2) Petitioner has no protected liberty interest in FTCs and, therefore, cannot state a Fifth Amendment due process claim; and (3) he fails to state an equal protection claim because he has not identified a proper comparator who was treated more favorably. These arguments, and Petitioner's counter-arguments, will be addressed on a claim-by-claim basis, proceeding in the following

order: Claim One, titled "habeas corpus"; ripeness under Rule 12(b)(1); and, because necessary, the merits under Rule 12(b)(6).

### A. **Claim One: "Habeas Corpus"**

Petitioner has not explained how his first claim, which is labeled "habeas corpus" (Doc. # 30 at 31), constitutes an independent ground for relief. Rather, it appears to function as a general characterization of the petition as one brought under 28 U.S.C. § 2241 and a restatement of the relief sought. Accordingly, this "claim" will not be analyzed separately as a standalone claim for relief. To the extent that Respondent challenges this "claim," and the petition as a whole, as improperly brought under § 2241 (*see* Doc. # 36 at 7–10), that argument is rejected. (*See, e.g.*, Doc. # 36 at 7 (arguing that Petitioner fails to state a claim for habeas relief because "his requested relief would not impact the fact or duration of his confinement").) Although Respondent urges the court to reconsider its previous conclusion in *Woolsey v. Washington*, 2025 WL 2598794, at *7–11 (M.D. Ala. Sept. 8, 2025) (*see* Doc. # 36 at 7–10), those arguments are rejected. The court continues to rely on *Woolsey*'s analysis and finds that "jurisdiction under § 2241 exists for Petitioner's claims seeking placement in prerelease custody." *Woolsey*, 2025 WL 2598794, at *11.

**B. Jurisdiction: Ripeness**

Ripeness is "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Reno v. Catholic Soc. Serv., Inc.*, 509 U.S. 43, 58 n.18 (1993). Whether a claim is ripe presents a subject matter jurisdictional issue. *Maron v. Chief Fin. Officer of Fla.*, 136 F.4th 1322, 1329 (11th Cir. 2025).

"Ripeness is peculiarly a question of timing." *Heller Bros. Packing Corp. v. Illinois Union Ins. Co.*, 2024 WL 5103506, at *2 (11th Cir. Dec. 13, 2024) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580 (1985)). The test for ripeness has two components: "(1) the fitness of the issues for judicial decision, and (2) the hardship to the parties of withholding court consideration." *Mobile Baykeeper, Inc. v. Ala. Power Co.*, 175 F.4th 1316, 1326 (11th Cir. 2026) (citation omitted). "The fitness prong is typically concerned with questions of finality, definiteness, and the extent to which resolution of the challenge depends upon facts that may not yet be sufficiently developed." *Harrell v. The Fla. Bar*, 608 F.3d 1241, 1258 (11th Cir. 2010) (internal quotation marks and citation omitted). "[C]laims are less likely to be considered 'fit' for adjudication when they venture beyond purely legal issues or when they require 'speculation about contingent future events.'" *Pittman v. Cole*, 267 F.3d 1269, 1278 (11th Cir. 2001) (quoting *Cheffer v. Reno*, 55 F.3d 1517, 1524 (11th Cir. 1995)); *see also Texas v. United States*, 523 U.S. 296,

300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." (citation omitted)). "The hardship prong asks about the costs to the complaining party of delaying review until conditions for deciding the controversy are ideal." *Harrell*, 608 F.3d at 1258.

Respondent contends that Petitioner's petition is not ripe for review because, even accepting Petitioner's FTC calculations and projections, he would not be eligible to transfer to prerelease custody until May 20, 2027. In other words, according to Respondent, the fitness prong of ripeness precludes resolution of the petition because the challenged FTCs and projections "would not result in his immediate release to supervised release or his immediate transfer to prerelease custody." (Doc. # 36 at 3, 5.) Relying principally on 18 U.S.C. § 3624(g)(1)(A), Respondent argues that the petition is "premature because a prisoner's future accumulation of FTCs is speculative and contingent on future variables." (Doc. # 36 at 5.) He points out also that FTCs can fluctuate based on a prisoner's recidivism risk classification and any conduct resulting in disciplinary action. (Doc. # 36 at 6.)

Petitioner addressed ripeness in his petition and in his reply. He contends that "the BOP's misinterpretation of the FSA has concretely affected [Petitioner] such that this matter is ripe for review." (Doc. # 30 at 29.) He points out that, after exhaustion of administrative remedies, the BOP has definitively determined he

cannot earn or apply the disallowed FTCs. (Doc. # 30 at 30.) Additionally, he argues that the BOP's failure to project the FTCs he would earn during prerelease custody and to apply those projected credits to advance his prerelease-custody eligibility date has immediate, concrete consequences. First, because RDAP placement is determined solely by a prisoner's projected FSA Conditional Placement Date, this allegedly incorrect date will delay his placement in the RDAP until it is too late for him to obtain the statutory sentence-reduction benefit. (Doc. # 30 at 30; Doc. # 40 at 3.) Second, if Petitioner's FTCs were correctly calculated under the FSA and his Conditional Transition to Community Date properly reflected as May 20, 2027, he would fall well within the BOP's 17–19 month prerelease planning window, regardless of RDAP participation. (Doc. # 40 at 3.)

The analysis turns to whether Claims Two, Three, and Four are ripe.

**1. *Claim Two (FSA Statutory Violations)***

**a. Claim Two: Not Ripe for Adjudication**

Claim Two is categorized as alleging violations of the FSA, specifically, 18 U.S.C. §§ 3624(g)(1)(A)–(C), 3632(d)(4)(C). (*See* Doc. # 30 at 32 (alleging that the "*Second Claim for Relief*" is for a "Violation of the First Step Act, 18 U.S.C. §§ 3624(g)(1)(A)–([C]), 3632(d)(4)(C)").) This is, therefore, a statutory-violation claim.

Sections 3632(d)(4)(C) and 3624(g) operate together for applying FTCs and effectuating any resulting transfer to prerelease custody or supervised release. Section 3632(d)(4)(C) provides that FTCs earned by eligible prisoners "who successfully participate in" EBRR programs or PAs "shall be applied toward time in prerelease custody or supervised release" and further directs that the BOP "shall transfer eligible prisoners, as determined under section 3624(g), into prerelease custody or supervised release."[9] § 3632(d)(4)(C). Section 3632(d)(4)(C), thus, incorporates § 3624(g) for the determination of a prisoner's eligibility for transfer. Section 3624(g)(1) governs the application of earned FTCs and conditions their application on the prisoner's satisfaction of multiple statutory requirements. One of those conditions is that the eligible prisoner must "ha[ve] earned time credits . . . in an amount that is equal to the remainder of the prisoner's imposed term of imprisonment." § 3624(g)(1)(A). Accordingly, Claim Two implicates both § 3632(d)(4)(C) and § 3624(g).

Even under Petitioner's own calculations, he would not be eligible to have his FTCs applied toward transfer to prerelease custody until May 20, 2027. (Doc. # 30 at 24–25, 31; Doc. # 36-1 at 14.) Petitioner thus cannot meet the threshold statutory requirement that he have FTCs "in an amount that is equal to the remainder of [his] imposed term of imprisonment." § 3624(g)(1)(A). Until that condition is met, he is

[9] There is no dispute that Petitioner is eligible to earn and has earned FTCs.

not yet eligible for transfer to prerelease custody under § 3632(d)(4)(C). Because this statutory prerequisite for applying earned FTCs has not yet been met, Claim Two is premature.

The Eleventh Circuit has not yet addressed this precise ripeness issue, but numerous persuasive district decisions support the conclusion. In *Mendoza v. Unknown Party*, the district court concluded that the § 2241 petition's claim alleging a violation of § 3632(d)(4)(C) was not ripe. *See* 2025 WL 3900821 (D. Ariz. Nov. 17, 2025), *R&R adopted*, 2026 WL 49611 (D. Ariz. Jan. 7, 2026). There, under the petitioner's proposed calculations, he would not have been eligible to apply the disputed FTCs for more than eight months; therefore, the "transfer instruction in § 3632(d)(4)(C)" would not be implicated until that future date. Because the statutory conditions for applying FTCs had not yet been met, the claim was not ripe for review. *See id.*

Moreover, "[f]ederal courts around the country read Section 3624(g)(1)(A) to mean that 'the BOP is permitted to apply time credits only once an inmate' has earned enough 'that equal the remainder of her sentence.'" *Adkins v. Engleman*, 2022 WL 14966123, at *2 (C.D. Cal. Sept. 8, 2022) (quoting *Lallave v. Martinez*, 609 F. Supp. 3d 164, 183 (E.D.N.Y. 2022)), *R&R adopted*, 2022 WL 15116425

(C.D. Cal. Oct. 24, 2022).[10] One reason is because FTCs are subject to forfeiture and, thus, "may be lost." *Lallave*, 609 F. Supp. 3d at 183; *see also Eviglo v. Eischen*,

[10] *See also Stinson v. Warden of FCI Talladega*, 2026 WL 2093690, at *1 (N.D. Ala. June 10, 2026) (recommending dismissal of a § 2241 petition as unripe where the petitioner alleged no present or imminent direct injury from the BOP's failure to effectuate a future FSA conditional placement date based on earned FTCs), *R&R adopted*, 2026 WL 2088523 (N.D. Ala. July 20, 2026); *Simental-Lopez v. Warden, FCI Mendota*, 2025 WL 3754372, at *3 (E.D. Cal. Dec. 29, 2025) ("[A]s Petitioner has not earned enough credits that equal the remainder of his sentence, he is not eligible to apply any FSA time credits at this time, 18 U.S.C. § 3624(g)(1)(A), the claim is unripe, and dismissal is warranted on this ground."), *R&R adopted*, 2026 WL 825720 (E.D. Cal. Mar. 25, 2026); *Cook v. Gunther*, 2025 WL 3490728 at *1, 4 (D. Ariz. Sept. 16, 2025) (explaining that the petitioner was alleging that the BOP "ha[d] refused to accurately calculate" his FTCs, *id.* at *1, but recommending dismissal of claim as unripe because he was "not yet eligible for application of the credits" toward prerelease custody or supervised release, *id.* at *4), *R&R adopted in part*, 2025 WL 3170931, at *1 (D. Ariz. Nov. 13, 2025) (adopting the magistrate judge's "conclusion that the petition is premature" and explaining that "[d]istrict courts throughout the Ninth Circuit . . . have cited [§ 3624(g)(1)(A)] in finding § 2241 petitions premature because they cannot award the relief sought under the FSA until the petitioner's recalculated time credits would equal the remainder of the imposed term of imprisonment"); *Holland v. Gabby*, 2025 WL 1287749, at *2 (N.D. Fla. Apr. 9, 2025) ("*Application* of the FSA credits is tricky . . . because although [the petitioner] is eligible to earn credits, her credits become eligible to be *applied* only when she has earned credits 'in an amount that is equal to the remainder of [her] imposed term of imprisonment.'" (second alteration in *Holland*) (footnote omitted) (quoting § 3624(g)(1)(A))), *R&R adopted*, 2025 WL 1285822 (N.D. Fla. May 1, 2025); *Carlson v. FCC Lompoc*, 2024 WL 5316829, *1 (C.D. Cal. Nov. 12, 2024) ("In the present case, Petitioner's 'earned time credits' (even as alleged by Petitioner) are far fewer than 'an amount that is equal to the remainder of [Petitioner's] imposed term of imprisonment.' Therefore, Petitioner is not yet eligible for the application of time credits, and the Petition should be denied and dismissed without prejudice."), *R&R adopted*, 2025 WL 327272 (C.D. Cal. Jan. 27, 2025), *appeal docketed*, No. 25-2199 (9th Cir. Apr. 4, 2025); *Pujols v. Stover*, 2023 WL 4551423, at *1 (D. Conn. July 14, 2023) ("[T]he inmate is not 'eligible' for application of his FSA time credits until the number of credits equals the number of days remaining in his sentence."); *Eviglo v. Eischen*, 2023 WL 3597907, at *2 (D. Minn. May 23, 2023) ("[T]he [28 U.S.C. § 2241] petition is not ripe for adjudication as [the petitioner] is currently not entitled to have his time credits applied under 18 U.S.C. § 3624(g)(1)(A)."); *Turner v. Heisner*, 2022 WL 2195348, at *2 (D. Ariz. May 16, 2022) (recommending dismissal of the § 2241 petition as unripe because the petitioner's claimed FTCs did not equal the remainder of his sentence, even though the petitioner disclaimed any request for immediate application of FTCs and sought only to have his FTCs for a specified period "properly calculated now and verified, in writing, to ensure that there will be no discrepancies when [he is] eligible to apply them"), *R&R adopted sub nom. Turner v. Cole*, 2022 WL 2192212 (D. Ariz. June 17, 2022); *cf. Sample v. Morrison*, 406 F.3d 310, 313 (5th Cir. 2005) (per curiam) (holding that a habeas petition asserting that the BOP was calculating good time credit contrary to the applicable

2023 WL 3597907, at *2 (D. Minn. May 23, 2023) (FTCs "are not applied until credits equal the remainder of the term of imprisonment because time credits are subject to change based upon the inmate's continued participation in eligible programs, recidivism risk classification, and conduct resulting in disciplinary action.").

To illustrate further, in *Athikulrat v. Cooper*, the Western District of Washington found that the petitioner's FSA time-credit claim was unripe because, even if he prevailed and received the additional FTCs he sought beyond the 315 FTCs already earned, his earliest possible release date would advance only from June 8 to early April—still roughly eleven months away. *See* 2025 WL 1533193, at *3 (W.D. Wash. May 14, 2025), *R&R adopted*, 2025 WL 1530428 (W.D. Wash. May 29, 2025). Because litigation success would not result in the petitioner's "imminent release," the claim was dismissed as unripe. *Id.*; *see also Harleman v. Warden, Fed. Det. Ctr. SeaTac*, 2024 WL 4957499, at *2 (W.D. Wash. Aug. 22, 2024) ("[A] habeas claim alleging the BOP miscalculated FSA time credits is ripe for review only if a favorable disposition of the claim would result in the petitioner's imminent release."), *R&R adopted*, 2024 WL 4950133 (W.D. Wash. Dec. 3, 2024). "Though perhaps inconvenient for litigants, it has been observed that dismissing

federal statute was not ripe where the prisoner would not be eligible for release for seven more years and good time credit had to be earned on an annual basis).

unripe petitions avoids the issuance of advisory opinions directing the release of a prisoner who may or may not maintain their earned FSA time credits." *Athikulrat*, 2025 WL 1533193, at *3 (citations omitted);

Furthermore, § 3624(g)(1) sets out multiple independent prerequisites for the application of FTCs, which must be satisfied before FTCs may be applied toward prerelease custody or supervised release. For example, § 3624(g)(1)(B) requires that the prisoner demonstrate a reduction in recidivism risk or maintain a minimum or low recidivism risk during the term of imprisonment. Based on this criterion, the Northern District of West Virginia emphasized that a prisoner "may be eligible under 18 U.S.C. § 3632(d) to earn and receive time credits but not eligible to have those credits applied under 18 U.S.C. § 3624(g)." *Nevel v. Brown*, 2023 WL 8505881, at *5 (N.D. W. Va. Oct. 27, 2023), *R&R adopted*, 2023 WL 7490046 (N.D. W. Va. Nov. 13, 2023). In *Nevel*, the prisoner was "ineligible to have [his] credits applied" because his recidivism risk was "high," and, thus, he did not satisfy the requirement in § 3624(g)(1)(B). *Id.* at *2; *see also Brown v. Ray*, 2024 WL 5465060, at *7 (N.D. W. Va. Oct. 3, 2024) ("Multiple district courts within the Fourth Circuit have held that a prisoner may be eligible under 18 U.S.C. § 3632(d) to earn and receive time credits, but may not be eligible to have those credits applied under 18 U.S.C. § 3624(g)." (collecting cases)), *R&R adopted*, 2025 WL 369952 (N.D. W. Va. Feb. 3, 2025). Accordingly, even where a prisoner has earned FTCs under § 3632(d),

those credits cannot be applied unless, and until, the prisoner independently satisfies § 3624(g)(1)'s separate eligibility requirements. This distinction further bolsters the conclusion that Claim Two is not ripe because, even assuming Petitioner has earned the disputed FTCs, any entitlement to have those credits applied turns on additional, forward-looking determinations under § 3624(g)(1), so the alleged injury remains contingent rather than concrete and fit for judicial resolution.

As some prisoners argued in the foregoing cases, Petitioner also alleges that the BOP has unlawfully denied or withheld earned FTCs and contends that this alleged violation should be remedied now through an order directing the BOP to award those FTCs, even though they would not be applied until a later date. (Doc. # 30 at 32–33, 37–38; *see also* Doc. # 41 at 3 (reiterating that Petitioner "challenges the BOP's calculation and application of FSA time credits under 18 U.S.C. § 3632(d)(4)").) Petitioner, however, has not articulated a persuasive basis for concluding that the allegedly unlawful withholding of FTCs materially changes the ripeness analysis for his claim alleging a violation of 18 U.S.C. §§ 3624(g)(1)(A)–(C) and 3632(d)(4)(C). He tries to argue that the BOP's miscalculation of his FTCs presents an "immediate injury" because "the real-world consequences" of the BOP's miscalculation of his FTCs affects his "Conditional Transition to Community Date, a component of which is his FSA Conditional Placement Date, which is a precondition to RDAP eligibility." (Doc. # 40 at 17.) But Petitioner acknowledges

that "[t]his court lacks jurisdiction to review the BOP's individualized decisions regarding RDAP placement, including any alleged delays in admission or anticipated reductions for completion, which can be up to one year." *Council v. Washington*, 2025 WL 3461553, at *4 (M.D. Ala. Dec. 2, 2025) (citing 18 U.S.C. § 3621(e)(2)(B)); (Doc. # 40 at 11 n.4 ("Again, [Petitioner] is not challenging the BOP's discretion related to RDAP placement and sentence reduction.").) However, he says that his FSA Conditional Placement Date "represents his FSA credits [FTCs] and determines his enrollment priority in RDAP, the completion of which may subtract up to an additional year from a prisoner's sentence." (Doc. # 40 at 7.)

In *Council*, this court found that a petitioner "cannot bypass this preclusion [of judicial review of the BOP's discretionary decisions regarding RDAP placement and sentence reductions for RDAP completion] by arguing that his claims for FSA time credits, both accrued and projected, are ripe based on their potential effect on RDAP placement." 2025 WL 3461553, at *4. Here, although Petitioner's argument has some intuitive appeal, it ultimately depends upon a chain of contingencies, namely, RDAP placement, a discretionary sentence reduction, and the downstream effect of FTCs on those determinations. To illustrate, Petitioner has submitted an exhibit that he says shows he is on the waitlist for RDAP. (Doc. # 40-6.) The exhibit shows only that Petitioner requested to be added back to the RDAP waitlist on April 2, 2026. (Doc. # 40-6.) But even if he is admitted, he must still complete the

program, which is not assured. Then, even if he completes RDAP, any sentence reduction of up to one year is not automatic but remains a discretionary decision by the BOP and the amount of a sentence reduction (if any) is uncertain. Layering speculative, future FTC projections onto the already discretionary and uncertain RDAP process renders the claim too contingent for judicial review. Also, the absence of supporting authority for this argument, of which none has been cited or independently located, further confirms that Claim Two is not ripe.

Furthermore, Petitioner's statutory-violation claim does not present a purely legal issue, as evidenced by Petitioner's subsequent motion seeking discovery concerning the BOP's calculation of his FTCs (Doc. # 41). *See Pittman v. Cole*, 267 F.3d 1269, 1278 (11th Cir. 2001) ("[C]laims are less likely to be considered 'fit' for adjudication when they venture beyond purely legal issues . . . ." (quoting *Cheffer v. Reno*, 55 F.3d 1517, 1524 (11th Cir. 1995)).

**b. Claim Two: Ripeness Summary, Alternative Basis for Dismissal, and Concluding Observation**

Claim Two is not ripe because, because even accepting Petitioner's own FTC calculations, Petitioner is not yet eligible for application of his FTCs under §§ 3624(g)(1)(A)–(C) and 3632(d)(4)(C). His claim alleging statutory violations necessarily depends, at least partially, on contingent future events, namely, the passage of time and the accrual and retention of sufficient FTCs to equal the remainder of his term of imprisonment. These events "may not occur as anticipated,

or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (citation omitted).

Alternatively, even if this claim were ripe, it would fail under Rule 12(b)(6) of the Federal Rules of Civil Procedure for the same basic reason: Petitioner does not allege facts showing that a violation of §§ 3624(g)(1)(A)–(C) and 3632(d)(4)(C) has occurred. *Cf. Cook v. Gunther*, 2025 WL 3170931, at *1 (D. Ariz. Sept. 16, 2025) (finding the claim unripe but also observing that "[t]he FSA's subsection governing eligibility for prerelease custody or supervised release—the remedy Cook seeks—makes clear the subsection does not apply until the prisoner 'has earned time credits . . . in an amount that is equal to the remainder of the prisoner's imposed term of imprisonment.'" (quoting 18 U.S.C. § 3624(g)(1)(A))). Thus, Claim Two of the amended petition does not state a claim upon which relief can be granted.

As a final observation, Petitioner cites two decisions from the Middle District of Alabama to support his statutory-violation theory that the BOP cannot categorically deny eligible prisoners earned FTCs in contravention of § 3632: *Sharma v. Peters*, 756 F. Supp. 3d 1271 (M.D. Ala. 2024) and *Woolsey v. Washington*, 2025 WL 2598794, at *1 (M.D. Ala. Sept. 8, 2025). (*See* Doc. # 30 at 13–14.) The jurisdictional issue of ripeness was not raised or addressed in *Sharma*, and *Woolsey* involved a petitioner who alleged he was eligible for immediate placement in prerelease custody based on earned FTCs, unlike the posture

here. *See Woolsey*, 2025 WL 2598794, at *1. Because ripeness has been squarely presented in this case, it has been resolved first and is dispositive.

### 2. *Claims Three and Four (Due Process/Equal Protection Violations)*

Petitioner's due process and equal protection claims seek the same goals as the statutory-violation claim, namely, recalculation and application of his FTCs, and the parties advance the same ripeness arguments for all claims. Because neither party meaningfully distinguishes Claims Three and Four for ripeness purposes (*see* Doc. # 30 at 29–31; Doc. # 36 at 3–7; Doc. # 40 at 2–5), the same conclusion as to Claim Two is reached here: These claims are not ripe. However, even if Claims Three and Four are ripe, they fail on the merits as a matter of law for the reasons discussed below.

## C. Claim Three: Fifth Amendment Due Process Violation

In Claim Three, Petitioner alleges that "[t]he FSA created a protected liberty interest in the FSA's earned time credits." (Doc. # 30 ¶ 130.) He contends that the BOP violated his federal due process rights by withholding, miscalculating, and failing to project and apply those credits. (Doc. # 30 ¶¶ 132–34.)

The Fifth Amendment provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend V. To state a due process violation based on the deprivation of a liberty interest, Petitioner must allege (1) "that he possessed a constitutionally protected interest in liberty," (2) "that

the government deprived him of that interest," and (3) "that the procedures accompanying that deprivation are constitutionally inadequate." *Bradshaw v. Fed. Aviation Admin.*, 8 F.4th 1215, 1224 (11th Cir. 2021) (cleaned up). Here, Petitioner's claim fails because he cannot satisfy the first element as he has no protected liberty interest in earning FTCs.

Since January 2025, five courts of appeals have addressed whether the FSA creates a liberty interest in FTCs, and each has held that it does not, two in published decisions and three in unpublished decisions. *See White v. Warden of Fed. Corr. Inst. - Cumberland*, 164 F.4th 326, 334 (4th Cir. 2026); *Cheng v. United States*, 132 F.4th 655, 659 (2d Cir. 2025) (per curiam); *Lopez v. Emmerich*, 2025 WL 3172841 (7th Cir. Nov. 13, 2025); *Vargas v. Rivers*, 2025 WL 1380067, at *1 (5th Cir. May 13, 2025) (per curiam); *Sedlacek v. Rardin*, 2025 WL 948485, at *1 (6th Cir. Jan. 21, 2025). The parties have not cited or addressed these decisions, and the court is not aware of any contrary authority from another circuit court of appeals.

Although the factual settings varied, the petitioners advanced the same core theory, namely, that they had a Fifth Amendment protected liberty interest in FTCs that were unavailable either because the BOP denied them or because the petitioner was statutorily ineligible to earn them. In *White*, for example, the petitioner filed a 28 U.S.C. § 2241 petition, claiming a protected liberty interest in FTCs that the BOP

refused to award. The Fourth Circuit held that the FSA does not create a due process liberty interest in earning or applying FSA time credits. The court reasoned that

> a prisoner claiming rights to FSA time credits cannot show that he has a statutory entitlement to those credits. Although awarding FSA time credits is mandatory if the prisoner qualifies for and earns them, those conditions, which are solely determinative of the right to credits, indicate that the prisoner cannot legitimately expect that he has a right to them. Under the FSA, a prisoner must first qualify for the opportunity to earn credits by an initial assessment of his recidivism risk and regular reassessments thereafter under a comprehensive and complex "risks and needs assessment system." 18 U.S.C. § 3632. Moreover, even if a prisoner is eligible for the opportunity to earn FSA time credits, he may lose that opportunity during certain periods for reasons untethered to his conduct, such as due to practical limitations on the BOP's ability to provide qualifying programming in given situations. *See, e.g.*, 18 U.S.C. § 3621. Additionally, an eligible prisoner with the opportunity to earn credits can only do so through "successful participation" in and "successful[ ] complet[ion]" of programming that is designed specifically for him, based on the BOP's assessments. *Id.* § 3632(d)(4). And in any event, the credits, even after they have been earned, are subject to withdrawal if the prisoner violates certain rules in prison. *See id.* § 3632(e). In addition, they may only be applied to reduce the prisoner's term of incarceration if he has a sufficiently low risk of recidivism or if the warden approves a waiver of that requirement. *See id.* § 3624(g).
>
> Because the earning and application of FSA time credits are contingent upon numerous conditions both within and outside of a prisoner's control, the FSA does not create a statutory entitlement to those credits.

164 F.4th at 334. The Fourth Circuit expressly aligned itself with the Second, Fifth, and Sixth Circuits (*Cheng*, *Vargas*, and *Sedlacek*, respectively), agreeing with those courts "that the FSA does not create a protected liberty interest in earning FSA time credits." *Id.*

The Fifth Circuit's decision in *Vargas* is particularly instructive here. *See* 2025 WL 1380067, at *1. The Fifth Circuit rejected the due process claim because the petitioner had "no fundamental liberty interest" in IFRP participation or in the incentives tied to that voluntary program, "including the ability to earn FSA time credits." 2025 WL 1380067, at *1. The court explained that, because prisoners have "no entitlement to any of the benefits agreeing to participate in the IFRP would provide," the IFRP's consequences reflect the loss of privileges rather than the imposition of an atypical hardship. *Id.* (quoting *Driggers v. Cruz*, 740 F.3d 333, 338 (5th Cir. 2014)).

The Second and Sixth Circuits, as well as the Seventh Circuit, reached the same conclusion where the petitioners were statutorily ineligible under the FSA to earn FTCs. In *Sedlacek*, the Sixth Circuit held that the FSA does not create a protected liberty interest in earning FTCs because the credits are conditional and do not amount to an entitlement. It, therefore, rejected the due process challenge to the statutory exclusion at issue. *See* 2025 WL 948485, at *1. And, in *Cheng*, the Second Circuit rejected a due process claim, reasoning that "the FSA, taken as a whole, makes clear that noncitizens with final orders of removal are not eligible for time credits" under the statute. 132 F.4th at 659. Finally, in *Lopez*, the Seventh Circuit reasoned that the "shall" language in 18 U.S.C. § 3632(d)(4)(C) did not create a protected liberty interest on the facts before it because another provision of the same

statute, § 3632(d)(4)(E), expressly bars noncitizen prisoners subject to final orders of removal from applying FTCs toward prerelease custody or early release, and the prisoners did not dispute that they were subject to such orders. *See* 2025 WL 3172841, at *2.

The parties do not mention the foregoing uniform appellate authority, but they do cite this court's decision in *Woolsey v. Washington*, 2025 WL 2598794, at *13–17 (M.D. Ala. Sept. 8, 2025). (*See* Doc. # 40 at 26–27; Doc. # 36 at 10–11.) There, liberally construing the *pro se* petition and related filings as alleging that the BOP revoked previously earned FTCs without notice, despite the petitioner's compliance with all eligibility criteria, the court considered whether the deprivation of already-earned FTCs may implicate due process differently than the opportunity to earn FTCs in the future. The discussion traced the framework in *Wolff v. McDonnell*, 418 U.S. 539 (1974) and *Sandin v. Conner*, 515 U.S. 472 (1995), including whether earned FTCs are sufficiently analogous to the good-time credits at issue in *Wolff* and whether their revocation imposes an "atypical and significant hardship." *See Woolsey*, 2025 WL 2598794, at *13–16.

No party sought reconsideration of the *Woolsey* decision, and the case never proceeded to an evidentiary hearing because the petitioner was released. *See Woolsey v. Washington*, 2026 WL 50639, at *1 (M.D. Ala. Jan. 7, 2026). However, *Woolsey* turned on the court's construction of the *pro se* pleadings as alleging that

the BOP awarded FTCs after the petitioner satisfied the statutory eligibility criteria but later rescinded those FTCs without due process. The circumstances here are different: Petitioner alleges he is entitled to FTCs that should have been awarded in the first instance but were not, whereas the BOP maintains that he never qualified for those credits at all. Petitioner also seeks relief based on projected future FTCs, which, by definition, have not yet been earned. Even if these distinctions ultimately prove immaterial, Harris's petition, not Woolsey's, is before the court today.

In sum, the consistent appellate authority holds that earning FTCs is contingent on statutory eligibility and multiple conditional determinations. Because Petitioner cannot establish a protected liberty interest in FTCs based on the facts alleged, Claim Three fails on the first element of a Fifth Amendment due process claim, and the sufficiency of the allegations regarding the withholding, calculation, and projection of FTCs need not be addressed.

**D. <u>Claim Four: Equal Protection Violation</u>**

Equal protection principles apply to the federal government through the Fifth Amendment's Due Process Clause. Although the Fifth Amendment does not contain an equal protection clause, it "forbid[s] discrimination that is so unjustifiable as to be violative of due process," and so "a classification [that] is invalid under the Equal Protection Clause of the Fourteenth Amendment . . . is also invalid under the Due

Process Clause of the Fifth Amendment." *Jackson v. State Bd. of Pardons & Paroles*, 331 F.3d 790, 793 n.1 (11th Cir. 2003) (citation omitted).

The Equal Protection Clause recognizes a "class-of-one" theory under which a petitioner need not allege membership in a protected class. To state such a claim, Petitioner must allege that he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam).

To be similarly situated, the individuals being compared "must be prima facie identical in all relevant respects." *Chabad Chayil, Inc. v. Sch. Bd. of Miami-Dade Cnty.*, 48 F.4th 1222, 1233 (11th Cir. 2022) (quoting *PBT Real Est., LLC v. Town of Palm Beach*, 988 F.3d 1274, 1285 (11th Cir. 2021)). The "similarly situated" is applied with particular rigor in the class-of-one context. *See Leib v. Hillsborough Cnty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1306 (11th Cir. 2009). No caselaw directly on point has been cited or found, but a decision from this district nonetheless illustrates the demanding nature of the similarly situated requirement for a class-of-one equal protection claim.

In *Sharma v. Peters*, the court analyzed a class-of-one equal protection claim based on the theory that the BOP used an older PATTERN scoring tool for the petitioner's initial risk assessment, which he contended resulted in unequal treatment compared to prisoners initially assessed under the updated PATTERN version. *See*

756 F. Supp. 3d 1271, 1278 (M.D. Ala. 2024). The court found that the petitioner failed to identify a similarly situated comparator who received more favorable treatment regarding which version of PATTERN was used to classify his recidivism risk. *See id.* The court reasoned that prisoners assessed after implementation of the new PATTERN were not similarly situated to the petitioner because their "assessment occurred on or after the updated version of the PATTERN tool became available." *Id.* at 1278–79. The petitioner also failed to show any statutory or constitutional mandate requiring retroactive application of the new PATTERN. "The mere fact that [the petitioner] may have received an earlier low risk classification under the latest PATTERN version does not, without more, reflect that he was subject to unequal treatment." *Id.* at 1279. Therefore, the petitioner could not establish a class-of-one equal protection claim for FTCs. *See id.*

"The rational basis test asks (1) whether the government has the power or authority to regulate the particular area in question, and (2) whether there is a rational relationship between the government's objective and the means it has chosen to achieve it." *Leib*, 558 F.3d at 1306. Under the rational basis standard, the government "has no obligation to produce evidence to sustain the rationality" of its classification. *Id.* (quoting *Heller v. Doe by Doe*, 509 U.S. 312, 320 (1993)). Instead, the challenger has the burden to negate "every conceivable basis that might

support it, even if the basis has no foundation in the record. *Id.* (citing *Heller*, 509 U.S. at 320).

### 1. *The Allegations*

Petitioner alleges a class-of-one equal protection claim. He asserts that "the BOP routinely awards [FTCs] to prisoners with shorter sentences while they are in prerelease custody and applies those [FTCs] to early supervised release." (Doc. # 30 ¶ 144; Doc. # 40 at 29 (citing Doc. # 30 ¶ 144).) He contends that these prisoners are similar to him "in all relevant respects," namely, with respect to "eligibility criteria, program participation, risk scores, and timing of accrual of credits." (Doc. # 30 ¶ 143.) He alleges, however, that the BOP intentionally treats prisoners serving multi-year sentences, like himself, less favorably because the BOP's FTC calculation method (applying FTCs first to the ultimate release date and only then to the FSA Conditional Placement Date) "precludes them from earning usable credits while in prerelease custody." (Doc. # 40 at 29–30.) He thus contends that he is deprived "of the right to earn [FTCs] while in prerelease custody," while his similarly situated comparators "receive the FSA's full benefits" (Doc. # 30 ¶¶ 147, 150), and that there is no rational basis for this disparate treatment.

**2. *Similarly Situated Comparator***

Respondent argues that Petitioner has not alleged a similarly situated comparator regarding the BOP's application of FTCs. It is helpful to begin with what is not alleged.

First, the claim does not allege that the shorter-sentenced prisoners are in prerelease custody because the BOP disregarded 18 U.S.C. § 3624(g)(1)(A), which permits application of FTCs only when an eligible prisoner "has earned time credits . . . in an amount that is equal to the remainder of the prisoner's imposed term of imprisonment." § 3624(g)(1)(A). In other words, Petitioner does not allege that the BOP applied FTCs to transfer shorter-sentenced prisoners into prerelease custody before their accrued credits equaled the days remaining on their sentences.

Second, the claim does not allege that, as to shorter-sentenced prisoners, the BOP deviates from its policy of applying the first 365 days of FTCs toward early transfer to supervised release. (Doc. # 36-1 at 2, ¶ 11.) Rather, prisoners with shorter sentences often cannot accrue 365 days of FTCs before they reach the stage at which only 365 days remain on their sentences. Relatedly, prisoners serving shorter sentences will necessarily reach the statutory threshold for applying FTCs sooner than prisoners, like Petitioner, serving multi-year terms because, at any given time,

they have fewer days remaining on their sentences. Petitioner's allegations do not dispute that basic premise.[11]

Turning back to the allegations actually pleaded, the issue is whether "prisoners with shorter sentences" (Doc. # 30 ¶ 144) are similarly situated, in all relevant respects, to prisoners with longer sentences like Petitioner with respect to the BOP's application of FTCs. As alleged, because the BOP applies FTCs toward early transfer to supervised release first—up to the statutory maximum of 365 FTCs (Doc. # 36-1 at 2)—the only prisoners who can earn FTCs while in prerelease custody that can actually be applied to reduce the term of imprisonment are (1) "those whose imposed sentence is not long enough to reach the 365-time-credit threshold prior to transfer to prerelease custody" and (2) "those who failed to complete any programming while in prison." (Doc. # 30 at 25–26 ¶ 82.) Petitioner's proposed similarly situated comparators are in the first group.

The proposed comparators, shorter-sentenced prisoners who can earn "usable" FTCs while in prerelease custody (*see* Doc. # 30 at 21 ¶ 68), are not similarly situated to Petitioner in all relevant respects. The FSA caps at 365 the number of FTCs that can be applied toward early transfer to supervised release, but it does not mandate that the first 365 FTCs be allocated toward early transfer to

---

[11] No view is expressed as to whether such allegations would survive Rule 12(b)(6) review; it is noted only that they are not the basis for the claims actually pleaded.

supervised release. *See* 18 U.S.C. § 3624(g)(3). However, the BOP has exercised its discretion to apply FTCs in that sequence, allocating up to 365 FTCs to supervised release first and treating the remaining FTCs as available to advance placement in prerelease custody. (Doc. # 36-1 at 2.)

Against that backdrop, prisoners serving shorter terms of imprisonment may reach prerelease custody before they have accumulated enough FTCs to reach the 365-FTC cap under the BOP's allocation method. As a result, FTCs earned during prerelease custody still can operate to reduce the term of imprisonment by allocation of FTCs toward an earlier transfer to supervised release. Petitioner's longer sentence places him in a different posture because it affords sufficient time to accrue and exhaust the first 365 FTCs before he reaches the point at which FTCs operate to advance prerelease placement. Any disparity flows from differences in sentence length, which in turn affect how the BOP's discretionary allocation methodology operates in practice. Because the proposed comparators are differently situated based on their sentence length, they are not similarly situated to Petitioner "in all relevant respects." (Doc. # 30 at 36 ¶ 143.)

Notably also, Petitioner does not seek relief directing the BOP to apply FTCs in whole or in part toward prerelease-custody placement once his FTCs equal the time remaining on his sentence so that, like his proposed comparators, he could continue earning additional FTCs while in prerelease custody. Instead, he wants his

prerelease-custody eligibility date to reflect his anticipated future FTCs, assuming he remains eligible and continues participating in qualifying programs. (Doc. # 30 at 27, 38.) But Petitioner's allegations identify no prisoner, much less a shorter-sentenced prisoner, for whom the BOP has applied projected FTCs before they are earned to accelerate placement in prerelease custody. That remedial omission is unsurprising. Although such relief could increase the time spent in prerelease custody, it also could delay Petitioner's ultimate transfer to supervised release by reallocating FTCs away from the supervised-release component. Two illustrations make this point.

First, assume that one month equals 30 days and that Petitioner has 935 days remaining on his sentence and has earned 935 FTCs.[12] If the BOP applied all 935 FTCs to place him in prerelease custody for the remaining 935 days, and he continued to earn FTCs at a rate of 15 days per month, after approximately 623 days in prerelease custody (about 20.77 months), he would have accrued about 312 new FTCs, which would be equal to the roughly 312 days then remaining on his sentence. At that point, those newly earned FTCs could be applied to transfer him to supervised release. But he would have lost the benefit of an early transfer to supervised release by 53 days.

---

[12] This illustration is overly simplistic because placement in prelease custody depends on multiple variables and statutory sources, including the SCA.

Second, using the same assumption that one month equals 30 days, if the BOP applied 200 of the 935 FTCs to accelerate Petitioner's transfer to supervised release, 735 FTCs would be applied toward placement in prerelease custody. Thus, Petitioner would enter prerelease custody with 735 days remaining on his term of imprisonment. If he continued to earn FTCs at a rate of 15 days per month, he would accrue about 245 new FTCs after approximately 490 days in prerelease custody (about 16.33 months). By then, about 245 days would remain on his sentence. Those newly earned FTCs could then be applied to transfer him to supervised release. But he would have lost the benefit of an early transfer to supervised release by 120 days.

Petitioner's class-of-one equal protection claim fails because he does not allege a similarly situated comparator, as required to state such a claim.

**3. *Rational Basis***

Respondent does not argue for dismissal of the class-of-one equal protection claim based on the rational-basis prong. However, independent research has not found any decision where a federal court has struck down on equal protection or other grounds the BOP's practice of allotting the first 365 days of FTCs toward transfer to supervised release.

The FSA preserves the BOP's discretion to decide how to allocate FTCs between supervised release and prerelease custody, including whether to apply the FTCs entirely to advance supervised release, entirely to accelerate placement in

prerelease custody, or some combination of the two. *See* 18 U.S.C. §§ 3624(g)(3); 3632(d)(4)(C); *see also Williams v. Warden, FCI Berlin*, 793 F. Supp. 3d 412, 418 (D.N.H. 2025) (explaining that "on balance the FSA preserves the BOP's discretion to determine how to allocate earned time credits between supervised release and prerelease custody, and whether to allocate the credits entirely to advance the term of supervised release, to advance the placement in prerelease custody, or both" (citation omitted)). The allegations do not elucidate how the BOP's practice, which applies FTCs in a manner that fully uses the 12-month cap in § 3624(g)(3), is anything other than a rational administrative judgment about how best to structure incentives for participation in EBRR programs or PAs. Indeed, as the rudimentary illustrations above suggest, this sequencing may give prisoners the greatest opportunity to reduce their actual term of imprisonment and to realize the FSA's full benefit of what is, in effect, a one-year sentence reduction.

Petitioner argues, however, that there is no rational basis for the BOP's strict sequential application of FTCs because, in his view, it effectively prevents prisoners serving longer, multi-year sentences from earning "usable" credits while in prerelease custody. But that argument rests on a flawed premise, namely, that FTCs are "unusable" unless they further advance placement in prelease custody.

In a closely analogous context, the Second Circuit rejected the same premise when a petitioner argued that the inability to apply earned FTCs to reduce the length

of supervised release would diminish incentives to participate in EBRR programs or PAs once the BOP applied 365 FTCs to advance the start of supervised release. *See Rivera-Perez v. Stover*, 171 F.4th 196, 209 (2d Cir. 2026). The Second Circuit explained that "excess [FTCs] are by no means wasted" because participants obtain meaningful rehabilitative benefits, such as "vocational training, substance abuse treatment, academic coursework, training in life skills, etc." *Id.* (citing 28 C.F.R. § 523.41(a)). As the court further explained:

> A prisoner with excess unused credits has benefited from those credits in much the same way a college student who completes more coursework than is necessary to graduate has still obtained a benefit: an education. Moreover, prisoners can benefit from taking courses or participating in productive activities in more immediately concrete ways too. For example, prisoners can receive phone or video conferencing privileges, additional time for visitation at the prison, transfer to a BOP facility closer to the prisoner's release residence, increased commissary spending limits and product offerings, extended opportunities to access email, or consideration of transfer to preferred housing units. *See* 18 U.S.C. § 3632(d)(1)–(3). Individuals can also cite the coursework and productive activities they completed when making an application to the district judge for early termination of their term of supervised release, and the district judge is free to consider them. *See* 18 U.S.C. § 3583(e).

*Id.*

Petitioner's "unusable" FTC premise is unpersuasive in light of *Rivera-Perez*'s reasoning. Even if FTCs earned during prerelease custody cannot further accelerate prerelease-custody placement, successful completion still advances the

FSA's rehabilitative aims (*e.g.*, skills, treatment, education), which is itself a rational and intended statutory incentive.

Finally, it is worth mentioning that Petitioner's proposed remedy also is vulnerable on its own terms. One could just as readily argue that front-loading FTC application, *i.e.*, applying FTCs to accelerate prerelease-custody placement before the FTCs are actually earned, would dilute incentives to continue participating in EBRR programs or PAs once the prisoner reaches prerelease custody. To be sure, that concern may be mitigated because the BOP retains authority to revoke earned FTCs for rule violations and, where appropriate, remove a prisoner from prerelease custody and return him to institutional confinement. But the point remains that Petitioner's approach is not self-evidently more incentive-compatible than the BOP's sequencing, and it underscores why the BOP's chosen framework is at least a rational administrative judgment.

For the foregoing reasons, the BOP's sequential application of FTCs, specifically applying the first 365 FTCs toward transfer to supervised release, survives rational-basis review, and Petitioner's class-of-one equal protection claim fails for this reason as well.

## VI. CONCLUSION

Petitioner's 28 U.S.C. § 2241 petition fails under Rule 12(b)(1) or, alternatively, under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Claim

One, labeled "Habeas Corpus," does not state an independent cause of action. Rather, it merely characterizes the petition as one brought properly under § 2241, a premise the court accepts. Claims Two, Three, and Four are not ripe because, even under Petitioner's own FTC calculations, he would not be eligible for transfer to prerelease custody until May 20, 2027. Thus, these claims fail Rule 12(b)(1) scrutiny and will be dismissed without prejudice. Alternatively, even if Claims Two, Three, and Four were ripe, they would fail as a matter of law under Rule 12(b)(6).

Accordingly, it is ORDERED that the amended petition for a writ of habeas corpus under 28 U.S.C. § 2241 is DISMISSED without prejudice.

Final judgment will be entered separately.

DONE this 19th day of August, 2026.

/s/ W. Keith Watkins
UNITED STATES DISTRICT JUDGE